/FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE___OCT 03 2013

_Madsen_
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Oct 3, 2013

_Shele A Carlon Deputy_
for Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SWINOMISH INDIAN TRIBAL COMMUNITY, a federally recognized Indian tribe, | ) ) ) ) | No. 87672-0 |
| Appellant, | ) ) | |
| v. | ) ) | En Banc |
| WASHINGTON STATE DEPARTMENT OF ECOLOGY, | ) ) ) | |
| Respondent. | ) ) ) ) | Filed ___OCT 03 2013___ |

MADSEN, C.J.—This case involves the validity of an amended rule from the Department of Ecology (Ecology) that reserves water from the Skagit River system for future year-round out-of-stream uses, despite the fact that in times of low stream flows these uses will impair established minimum instream flows necessary for fish, wildlife, recreation, navigation, scenic and aesthetic values. Ecology relies on RCW 90.54.020(3)(a) for authority to make the reservations of water despite the existing minimum flows. This statutory provision allows impairment of stream base flows when overriding considerations of public interest are served. The Swinomish Indian Tribal Community (Tribe) petitioned for review in superior court, challenging the validity of Ecology's amended rule reserving the water. The trial court upheld the amended rule and dismissed the Tribe's petition.

We conclude that Ecology has erroneously interpreted the statutory exception as broad authority to reallocate water for new beneficial uses when the requirements for

appropriating water for these uses otherwise cannot be met. The exception is very narrow, however, and requires extraordinary circumstances before the minimum flow water right can be impaired. Because the amended rule exceeds Ecology's authority under the statute, the amended rule reserving the water is invalid under the Administrative Procedure Act (APA), chapter 34.05 RCW. We reverse the trial court order dismissing the Tribe's petition.

## FACTS

The Skagit River system is the third largest system in the western United States, with more than 3,000 rivers and streams that flow into the Skagit River system. The river system is the only one in the 48 contiguous states in which all six species of Pacific salmon are found.[1] The river system provides water for a very large number of water right holders.

Under the state water code, Ecology has authority to set minimum stream flows to protect fish, game, birds or other wildlife resources, recreational and aesthetic values. On March 15, 2001, Ecology promulgated the "Skagit River Basin Instream Flow Rule" (Instream Flow Rule), chapter 173-503 WAC, which established regulations for the Skagit River basin, including minimum instream flow requirements. The rule did not allocate noninterruptible water for new uses; rather, water for new uses is subject to being shut off when stream flows fall to or below the minimums established by rule, in accord with general water law. Skagit County (County) and others opposed the rule, arguing

---

[1] Three of these species are listed as threatened under the Endangered Species Act of 1973, 16 U.S.C. §§ 1531-1544. *See* 50 C.F.R. § 17.11, § 223.102 (Coastal-Puget Sound bull trout, Puget Sound steelhead, and Puget Sound Chinook).

that it would effectively prevent new development that requires noninterruptible water the entire year, including homes, businesses, agriculture, and industry.

In April 2003, the County brought suit against Ecology, challenging the Instream Flow Rule under the APA. Over the following three years, attempts were made to reach a consensus on an amended rule permitting some new uses of water without interruption during times of low stream flows. These efforts were unsuccessful. Ecology then drafted a proposed rule amendment, which it thereafter revised in response to comments from interested parties.

During this rule-making process, the County offered to settle its pending suit against Ecology. The County proposed that in exchange for the County's dismissal of the suit and its cooperation in implementing the Instream Flow Rule, Ecology would revise its rule amendment to include a number of provisions. Ecology had already revised the amended rule to include some of the revisions that the County suggested and agreed to further revise the amended rule. On May 15, 2006, the County and Ecology entered into a settlement agreement and the suit was dismissed.

On the same day as the settlement agreement, May 15, 2006, Ecology issued the amended instream flow rule (Amended Rule),[2] which establishes reservations of water for specified uses. The Amended Rule establishes 27 reservations for domestic, municipal, commercial/industrial, agricultural irrigation, and stock watering out-of-stream uses. WAC 173-503-073, -075. The water for the new uses would not be subject

---

[2] The Instream Flow Rule and the Amended Rule each consist of more than one regulation but, like the parties and for convenience's sake, we refer to the total of these regulations in each instance in the singular form.

to shut off during periods when the minimum flows set in the 2001 Instream Flow Rule are not met, usually in late summer and early fall. Ecology says that the amount of water reserved is a very low percentage of the total flow during low flow periods and biologists from Ecology and the Department of Fish and Wildlife found that the amount of water reserved is less than an amount that would have significant impacts on fish populations in the river system.

Under the state water code, minimum flows and levels established by administrative rules, including the 2001 Instream Flow Rule, are appropriations of water with priority dates of the rules' adoption, and therefore water necessary to meet established minimum flows and levels is unavailable for appropriation to other uses. Further, withdrawal of water necessary to maintain minimum flows impairs an existing water right, contrary to law.

The water code also directs that base flows be retained in rivers and streams sufficient for preservation of fish, wildlife, scenic, aesthetic and other environmental values, and navigation. However, withdrawal of water that conflicts with base flows may occur under an exception that applies "where it is clear that overriding considerations of the public interest will be served." RCW 90.54.020(3)(a). Ecology relied on this exception for its authority to promulgate the Amended Rule.

Ecology found that important public interests would be significantly advanced by the reservations because without them new withdrawals for domestic, municipal, industrial, agricultural, and stock watering uses would be interrupted when stream flows

fall to the minimums established under the 2001 Instream Flow Rule; new sources of water were otherwise unavailable through most of the basin as a practical matter; and economic productivity would be gained.[3] Ecology then found that the impact on aquatic resources and recreational uses would be small, without significant harm to fish and wildlife, and would result in what Ecology calls a small monetary loss to fisheries.[4] Ecology concluded that the former benefits clearly override the latter potential harms.

In June 2008, the Tribe filed this action challenging the validity of the 2006 amended rule under the APA. On December 3, 2010, the superior court entered an order denying the Tribe's petition for review. The Tribe appealed.

## ANALYSIS

The Tribe contends that the Amended Rule is invalid because it exceeds statutory authority, arguing that the rule conflicts with several provisions in the water code that prohibit withdrawal of water when the withdrawal would impair minimum flows set by rule, RCW 90.03.247, RCW 90.03.345, and RCW 90.22.030. The Tribe contends that Ecology's reliance on the overriding-considerations exception is based on an incorrect interpretation of RCW 90.54.020(3)(a). The Tribe also contends that Ecology improperly aggregated the reservations to meet the overriding-considerations exception for all of the reservations, when many of the reservations would not satisfy even the test that Ecology uses to determine whether the exception applies. As the party challenging the rule, the

---

[3] Ecology's economists estimated gained economic productivity of $32.9 million to $55.9 million over 20 years.
[4] Ecology estimated a monetary value of this loss at $5.3 million over 20 years.

Tribe has the burden of establishing that the Amended Rule is invalid. RCW 34.05.570(1)(a).

At the outset, we note that the exception at issue is found in a provision calling for retention of "base flows," and the issue here is whether this exception applies to "minimum flows" established for streams in the Skagit River basin. Although the term "minimum flow" does not appear in RCW 90.54.020(3)(a), we have already determined that the overriding-considerations exception is applicable to minimum flows. *Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 81, 11 P.3d 726 (2000).

*Standards of Review*

The Tribe's challenge to the validity of the Amended Rule is reviewed under the APA. A court must declare an administrative rule invalid if it finds that "the rule exceeds the statutory authority of the agency." RCW 34.05.570(2)(c). Administrative "[r]ules must be written within the framework and policy of the applicable statutes," *Dep't of Labor & Indus. v. Gongyin*, 154 Wn.2d 38, 50, 109 P.3d 816 (2005), and so long as the rule is "reasonably consistent with the controlling statute[s]," an agency does not exceed its statutory authority. *Wash. Pub. Ports Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 646, 62 P.3d 462 (2003). However, "'[a]dministrative rules or regulations cannot amend or change legislative enactments.'" *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 19, 43 P.3d 4 (2002) (quoting *Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 600, 957 P.2d 1241 (1998)). Rules that are not consistent with the statutes that they

implement are invalid. *Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 715, 153 P.3d 846 (2007).

Whether the Amended Rule is valid depends, ultimately, on whether Ecology has correctly interpreted and implemented the exception in RCW 90.54.020(3)(a). This provision states:

> (3) The quality of the natural environment shall be protected and, where possible, enhanced as follows:
> (a) Perennial rivers and streams of the state shall be retained with base flows necessary to provide for preservation of wildlife, fish, scenic, aesthetic and other environmental values, and navigational values. Lakes and ponds shall be retained substantially in their natural condition. *Withdrawals of water which would conflict therewith shall be authorized only in those situations where it is clear that overriding considerations of the public interest will be served.*

RCW 90.54.020(3) (emphasis added).

When construing a statute, our goal is to determine and effectuate legislative intent. *TracFone Wireless, Inc. v. Wash. Dep't of Revenue*, 170 Wn.2d 273, 281, 242 P.3d 810 (2010); *Campbell & Gwinn*, 146 Wn.2d at 9-10. Where possible, we give effect to the plain meaning of the language used as the embodiment of legislative intent. *TracFone*, 170 Wn.2d at 281; *Campbell & Gwinn*, 146 Wn.2d at 9-10. We determine plain meaning ""'from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question."'" *TracFone*, 170 Wn.2d at 281 (quoting *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003) (quoting *Campbell & Gwinn*, 146 Wn.2d at 11)). In general, words are given their ordinary meaning, but when technical terms and terms of art are used, we give these terms their

7

technical meaning. *Tingey v. Haisch*, 159 Wn.2d 652, 658, 152 P.3d 1020 (2007); *City of Spokane ex rel. Wastewater Mgmt. Dep't v. Wash. State Dep't of Revenue*, 145 Wn.2d 445, 452, 454, 38 P.3d 1010 (2002).

We consider the statutory context, related statutes, and the entire statutory scheme when ascertaining the exception's plain meaning. *See TracFone*, 170 Wn.2d at 281; *Unruh v. Cacchiotti*, 172 Wn.2d 98, 113, 257 P.3d 631 (2011). These considerations are especially important here. First, resolving the meaning of a statutory provision concerning water rights almost always requires consideration of numerous related statutes in the water code. *See, e.g., Campbell & Gwinn*, 146 Wn.2d at 12-17; *Postema*, 142 Wn.2d at 77-83. Second, to understand the overriding-considerations exception, we must understand the general principles to which the exception applies. We also bear in mind that "generally exceptions to statutory provisions are narrowly construed in order to give effect to legislative intent underlying the general provisions." *R.D. Merrill Co. v. Pollution Control Hr'gs Bd.*, 137 Wn.2d 118, 140, 969 P.2d 458 (1999).[5]

In the Amended Rule, Ecology made 27 reservations of water from the Skagit River and its tributaries. RCW 90.54.050 authorizes Ecology to reserve and set aside, through administrative rules, water for future beneficial use in conjunction with programs provided for in RCW 90.54.040(1). RCW 90.54.040(1) directs that through the adoption

---

[5] If, after this inquiry, the statutory language is amenable to more than one reasonable interpretation, the statute is ambiguous and other tools are employed to ascertain its meaning. When an ambiguous statute addresses matters within an agency's particular expertise, considerable weight will be given to the agency's interpretation unless the interpretation conflicts with the statute or statutory scheme. *Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology*, 146 Wn.2d 778, 790, 51 P.3d 744 (2002); *Postema*, 142 Wn.2d at 77; *Theodoratus*, 135 Wn.2d at 589.

of appropriate rules Ecology is to develop and implement a comprehensive water resources program that will provide a process for future decisions on water resource allocation and use.

Water reservations are one way for Ecology to allocate water for specific future beneficial uses. Then, those seeking to use water that has been reserved under this process can submit "an application for a permit to make beneficial use of the public waters embodied in a reservation" and if the application is approved and a permit to beneficially use the water is issued, the priority date for the permit is the effective date of Ecology's reservation of the water. RCW 90.03.345.

*Ecology's Interpretation of the Exception*

There is no question that the 27 reservations in the Amended Rule impair the existing minimum flow rights because the uses for which the water is reserved are noninterruptible year-round uses and water will be withdrawn that will further reduce stream flows already at or below minimum flows. To justify the impairment of minimum flows, Ecology relies on the overriding-considerations exception in RCW 90.54.020(3)(a) using a "test" of its own devising to determine that the exception applies. In this balancing "test," Ecology determines whether and to what extent important public interests are served by the proposed reservations, whether and to what extent the reservations would harm any public interests, and whether the public interests served clearly override harm to public interests.[6]

---

[6] Ecology does not cite any rule or policy for this test.

On the benefits side Ecology placed the gained economic productivity in the river basin that Ecology determined would ensue from the water reservations over a 20-year period. Also on the benefits side, Ecology says that sources of water other than new withdrawals are as a practical matter unavailable and that without the reservations, new withdrawals for a number of beneficial water uses—stock watering, domestic, municipal, industrial, and agricultural uses—would be subject to interruption in times of low flow. Ecology found that impact on aquatic resources and recreational uses would be very small, and there would not be significant harm to fish and wildlife, with only a "small loss" to fisheries over 20 years. Ecology determined the significant benefits clearly overrode the potential harm.

*Postema*

Ecology's interpretation of RCW 90.54.020(3)(a) does not follow our discussion of the overriding-considerations exception in *Postema*. In *Postema*, we were chiefly concerned with issues regarding the relationship of groundwater withdrawal from aquifers in hydraulic continuity with surface water sources having minimum flows or levels set by rule. However, we discussed impairment of minimum stream flows because we held that denial of a permit to withdraw groundwater on the basis that withdrawal would impair minimum flows and levels water rights requires actual impact and hydraulic continuity alone does not establish such impairment.

Several important points concerning minimum flow rights and the overriding-considerations exception were established in *Postema* that bear on the present case. We

held that "[o]nce established, a minimum flow constitutes an appropriation with a priority date as of the effective date of the rule establishing the minimum flow. RCW 90.03.345. Thus, a minimum flow set by rule is an existing right which may not be impaired by subsequent groundwater withdrawals." *Postema*, 142 Wn.2d at 81. And we determined that "[t]he *narrow exception* to this rule is found in RCW 90.54.020(3)(a), which provides that withdrawals of water which would conflict with the base flows 'shall be authorized only in those situations where it is clear that overriding considerations of the public interest will be served.'" *Id.* (emphasis added). We concluded that a minimum flow water right is not a limited right, but rather "[a] minimum flow is an appropriation subject to the same protection from subsequent appropriators as other water rights, and RCW 90.03.290 mandates denial of an application where existing rights would be impaired." *Id.* at 82.

> No statute had been brought to our attention that
>
> requires any further weighing of interests once minimum flows have been established, and none requiring that economic considerations influence permitting decisions once minimum flows are set. Several statutes recognize that water is essential to the state's growing population and economy as well as necessary to preserve instream resources and values. RCW 90.54.010(1)(a); RCW 90.03.005 (describing policy of water use yielding maximum net benefits from both diversionary use of waters and retention of water instream to protect natural values and rights); RCW 90.54.020(2) (generally same); see also RCW 90.82.010; RCW 43.21C.030(2)(b) (State Environmental Policy Act of 1971); RCW 43.21H.010 (state economic policy act). However, none of these statutes indicate that they are meant to override minimum flow rights once established by rule, none conflict with the statutes authorizing or mandating rules setting minimum flows, and none conflict with the specific statutes respecting priority of minimum rights.

*Id.* at 82-83.

Here, as discussed in *Postema*, a minimum flow set by rule is an existing water right that may not be impaired by subsequent withdrawal or diversion of water from a river or stream. The exception in RCW 90.54.020(3)(a) is a *narrow* exception, not a device for wide-ranging reweighing or reallocation of water through water reservations for numerous future beneficial uses.

Ecology maintains, however, that *Postema* is distinguishable because there individual applications for new water right permits were at issue, while here, Ecology asserts, the Amended Rule is a water management rule for a particular watershed as a whole. Water reservations under RCW 90.54.050, for specified purposes, provides a way for future applicants to apply for permits to use this water for the designated beneficial uses. We see no meaningful difference between water reservations that reserve water for future individual applicants to obtain the right to put the water to those beneficial uses and individual applicants who presently seek to appropriate water for the same beneficial uses, insofar as impairment of the minimum or base flows is concerned. In both instances, the result is a water right held by an individual to the detriment of the existing minimum flow water right.

However, in *Postema* the overriding-considerations exception was not directly at issue, and we did not engaged in a detailed examination of its language or the statutory context to determine its meaning. We thus turn to the statutory interpretation analysis.

*Plain Language of the Exception in RCW 90.54.020(3)(a)*

Ecology's interpretation of the statute is not consistent with the statute and must be rejected. First, as the Tribe maintains, Ecology's balancing test treats beneficial uses of water as serving an overriding consideration of the public interest so long as total benefits from all beneficial uses outweigh the harm resulting from impairing the instream flows. But the statute does not use the term "beneficial uses" and it does not treat every potential beneficial use as serving the public, as opposed to a private, interest.

The plain language of the exception is that "rivers and streams . . . shall be retained with base flows" and withdrawals that would conflict with base flows are allowed only when "it is clear that overriding considerations of the public interest will be served." RCW 90.54.020(3)(a). Had the legislature meant "overriding considerations" to be a matter of weighing benefits flowing from "beneficial uses" against harm to instream uses and values after minimum flows have been set, it could have said so. The legislature has used the terms "beneficial use" and "beneficially use" throughout chapter 90.03 RCW and elsewhere in the water code, and plainly is aware of the importance and meaning of these terms.[7]

Further, in RCW 90.54.020(1) the legislature said that "[u]ses of water" for specified purposes "are declared to be beneficial." The legislature's choice of different words in another subsection of the same statute in which RCW 90.54.020(3)(a) appears shows that a different meaning is intended. *See Densley v. Dep't of Ret. Sys.*, 162 Wn.2d

---

[7] "Beneficial use" is a term of art having two specialized meanings in water law. *Theodoratus*, 135 Wn.2d at 589-90 (the term "'[b]eneficial use' refers to both the type of use and the measure and limit of the water right" (emphasis omitted)).

13

210, 219, 173 P.3d 885 (2007) (when different words are used in the same state, presumption is that a different meaning is intended). Thus, "public interests" in the exception is not equivalent to "beneficial uses." This is an important difference because beneficial uses may be uses that are public benefits only in the sense that any useful end to which water is put benefits the public. For example, here some of the water is reserved for exempt wells for domestic use on a noninterruptible basis—a private use, generally speaking, not a public use.

Moreover, Ecology's use of its balancing test to determine when the overriding-considerations exception will justify reservations of water for exempt domestic wells is not consistent with the statutory requirement of an "overriding" consideration. There is no question that continuing population growth is a certainty and limited water availability is a certainty. Under the balancing test, the need for potable water for rural homes is virtually assured of prevailing over environmental values. But the Water Resources Act of 1971, discussed below, explicitly contemplates the value of instream resources for future populations:

> Adequate water supplies are essential to meet the needs of the state's growing population and economy. At the same time *instream resources and values must be preserved and protected so that future generations can continue to enjoy them.*

RCW 90.54.010(1)(a) (emphasis added).

Ecology's test is insufficient to identify "overriding" considerations of public interest while giving effect to legislative intent that water for population growth would not trump domestic water needs in every instance and every area in the state where rural

14

development is thought to be desirable. In addition, Ecology's interpretation does not accord with the principle that as an exception, RCW 90.54.020(3)(a) must be narrowly construed. Rather, Ecology appears to use it as a way to reallocate water supply and priority of rights. Nothing in the limited number of words in the exception can be said to grant such expansive power.

*Prior Appropriation*

Moreover, Ecology's interpretation of the overriding-considerations exception is inconsistent with the entire statutory scheme. First, it conflicts with the prior appropriation doctrine. At the time Washington became a state, generally water rights could be acquired under either the riparian rights doctrine, under which water could be used by possessors of land adjacent to a water source, or the prior appropriation doctrine, under which those who put water to beneficial uses could obtain water for these uses without the necessity of the land being adjacent to the water source. When the 1917 surface water code was enacted, the prior appropriation doctrine was adopted as the sole method for obtaining new water rights, RCW 90.03.010, and a process for appropriating water was established that could result in obtaining a water right certificate for a set quantity of water to be applied to beneficial use(s).

Reservations of water under RCW 90.54.050 constitute appropriations of water. RCW 90.03.345 (a reservation of water is an appropriation having as its priority date the effective date of the reservation). Reservations of water must therefore meet the same requirements as any appropriation of water under the water code. "[B]efore a permit to

appropriate may be issued, Ecology must affirmatively find (1) that water is available, (2) for a beneficial use, and that (3) an appropriation will not impair existing rights, or (4) be detrimental to the public welfare." *Postema*, 142 Wn.2d at 79; *see* RCW 90.03.290(3).

But rather than meeting these requirements, under Ecology's interpretation of RCW 90.54.020(3)(a) reservations of water may be made using the overriding-considerations exception in place of satisfying these requirements. At least two of the requirements to appropriate water could not be met under RCW 90.03.290(3). The proposed beneficial uses are for noninterruptible year-round uses, but water is not available for the proposed noninterruptible out-of-stream uses for which the water reservations are made. In addition, year-round withdrawals of water will impair the existing minimum flow rights, another reason why an application to appropriate would have to be denied under RCW 90.03.290(3).[8]

Nevertheless, Ecology's "test" results in water being set aside for specified beneficial uses in the future, when those seeking to use water that has been reserved can apply for a permit to beneficially use the public waters embodied in the reservation. RCW 90.03.345. Because the water is already reserved, the applicant will not be barred from using the water on the ground that water is unavailable. In addition, impairment of existing rights will not be a bar under Ecology's test because the determination was already made that impairment of existing minimum flow water rights is justified under the overriding-considerations exception.

---

[8] The lack of available water is, of course, a result of the total water rights to withdraw water from the Skagit River and its tributaries. But if base flows did not have to be set and the minimum flow requirements did not exist, more water would be available.

But Ecology not only uses the overriding-considerations exception as a broad grant of authority to reallocate water committed to existing minimum flow water rights when an appropriation could not be granted under RCW 90.03.290(3), Ecology goes much further. Ecology reasons that (1) allowing new uses that otherwise would not be allowed because of lack of available water and (2) impairing existing rights so that year-round water may be obtained are "benefits" to be weighed in favor of the reservations of water that impair the existing minimum flow rights. In other words, Ecology uses the *very same reasons* why an application to appropriate water would have to be denied under RCW 90.03.290, lack of available water and impairment of existing rights, as reasons why the overriding-consideration exception of RCW 90.54.020(3)(a) applies.

Needless to say, this is a strained, unlikely interpretation of the overriding-considerations exception. *Densley* 162 Wn.2d at 233 (court avoids a strained, unlikely interpretation of a statutory provision). Nothing in the language used in RCW 90.54.020(3)(a) says that the overriding-considerations exception is intended as an alternative method for appropriating water when the requirements of RCW 90.03.290(3) cannot be satisfied for the proposed appropriation. This end-run around the normal appropriation process does not accord with the prior appropriation doctrine and the detailed statutes implementing the doctrine.

In addition, Ecology's aggregation of uses is also inconsistent with the prior appropriation scheme. Ecology aggregates the proposed uses to which the reserved water

will be put and then concludes the overriding-considerations exception applies to permit impairment of the minimum flow rights by all of the future uses.

When an application to appropriate water is made and impairment to existing rights is considered, "RCW 90.03.290 does not . . . differentiate between impairment of existing rights based on whether the impairment is de minimis or significant. If withdrawal would impair existing rights, the statute provides the application must be denied." *Postema*, 142 Wn.2d at 90. Yet, under Ecology's approach, a use that in and of itself has little, if any, public interest impact would be allowed to impair existing minimum flow water rights because it is combined with other uses for which water reservations are made.

Further, Ecology's view that future uses may be aggregated for purpose of the overriding-considerations exception is contrary to the basic principle of the prior appropriation doctrine that the first in time is the first in right. RCW 90.03.010; *Campbell & Gwinn*, 146 Wn.2d at 9; *Postema*, 142 Wn.2d at 79; *Longmire v. Smith*, 26 Wash. 439, 447, 67 P. 246 (1901). This "paramount rule" of the doctrine means that "'[t]he first appropriator is entitled to the quantity of water appropriated by him, *to the exclusion of subsequent claimants*.'" *Postema*, 142 Wn.2d at 80, 79 (emphasis added) (quoting *Longmire v. Smith*, 26 Wash. 439, 447, 67 P. 246 (1901)).[9] The prior

---

[9] Normally, the priority date for a water right relates back to the date the user made the application for a permit to appropriate water. RCW 90.03.340; *Postema*, 142 Wn.2d at 80 n.2; *R.D. Merrill*, 137 Wn.2d at 132. But if minimum flows or levels are in effect when a permit to appropriate is granted, the permit must be conditioned to protect the minimum flows or levels, RCW 90.03.247, and therefore the date the permit is approved, not the date of application, determines the priority date of the permit to appropriate and consequently whether the water

appropriation doctrine and the first in time first in right priority principle are founded on the idea that at some point the water in a stream or lake will be insufficient to satisfy all potential users, and that the rights of those who have already appropriated water to a beneficial use will be superior to any later appropriators.

*Minimum Flow Water Rights*

Ecology's interpretation of RCW 90.54.020(3)(a) is also contrary to the statutory scheme because it conflicts with provisions that give minimum flows set by rule the same status as other water rights. Although there were no "minimum flows or levels" or "base levels" to begin with, as time passed and the state's population increased demands on water resources also increased. While appropriative beneficial uses of water frequently remove water from the stream or lake, many other uses require that stream flows be maintained, including fish production, recreation, navigation, and power production. Growing, competing demands for water led to a number of new laws over time, and among these are acts and statutes designed to further the goal of retaining sufficient water in streams and lakes to sustain fish and wildlife, provide recreational and navigational opportunities, preserve scenic and aesthetic values, and ensure water quality.

In 1955, the Legislature declared the policy of the State to be that sufficient water flow be maintained in streams to support fish populations and authorized rejection of water right applications if these flows would be impaired. LAWS OF 1955, ch. 12, § 75.20.050 (codified as amended at RCW 77.57.020).

---

right obtained under the permit is subject to the minimum flows or levels. *Postema*, 142 Wn.2d at 80 n.2.

19

In 1969, the legislature enacted the Minimum Water Flows and Levels Act, chapter 90.22 RCW. This is the act that authorized Ecology to establish, by administrative rule, minimum flows or levels to protect instream flows necessary for fish and other wildlife, recreation and aesthetic purposes, and water quality. RCW 90.22.010 provides in part:

> The department of ecology may establish minimum water flows or levels for streams, lakes or other public waters for the purposes of protecting fish, game, birds or other wildlife resources, or recreational or aesthetic values of said public waters whenever it appears to be in the public interest to establish the same. In addition, the department of ecology shall, when requested by the department of fish and wildlife to protect fish, game or other wildlife resources under the jurisdiction of the requesting state agency, or if the department of ecology finds it necessary to preserve water quality, establish such minimum flows or levels as are required to protect the resource or preserve the water quality described in the request or determination.[10], [11]

Under the 1969 act, the minimum flows and levels "shall in no way affect existing water and storage rights" and "[n]o right to divert or store public waters shall be granted" by Ecology that conflicts with the minimum flows or levels adopted. RCW 90.22.030. In other words, a minimum flow or level cannot impair existing water rights and a later application for a water permit cannot be approved if the water right sought would impair the minimum flow or level. Thus, as indicated, minimum flows and levels established by

---

[10] The statute is substantially the same as when it was enacted. *See* LAWS OF 1969, 1st Ex. Sess., ch. 284, § 3.

[11] Washington House Bill 1384, 63d Leg. Reg. Sess. (Wash. 2013) would have made the Department of Ecology the sole agency for natural resource management, consolidating other agencies including the Department of Fish and Wildlife, and the bill would have amended RCW 90.22.010 to reflect this change. On May 13, 2013, in a special session following the regular legislative session, by resolution the bill was reintroduced and retained in present status.

rule are, like other appropriative water rights, subject to the rule of "first in time, first in right."[12] Minimum flow rights established by rule are treated as other water rights.

In 1971, the legislature enacted the Water Resources Act, which includes the overriding-considerations exception at issue in the present case. The Water Resources Act of 1971 was intended "to set forth fundamentals of water resource policy for the state to insure that waters of the state are protected and fully utilized for the greatest benefit to the people of the state of Washington and, in relation thereto, to provide direction to the department of ecology and other state agencies and officials, in carrying out water and related resources programs." LAWS OF 1971, 1st Ex. Sess., ch. 225, § 1.

The statement of purpose recognizes utilization of state water resources for "promotion of public health and the economic well-being of the state and the preservation of its natural resources and aesthetic values." RCW 90.54.010(1)(a). This broad statement of overall goals—the public health, the state's economic well-being, and *preservation of natural resources and aesthetic values*—shows the legislature continued to recognize that retention of waters instream is as much a core principle of state water use as the other goals, including economic well-being. In addition, more specific but still general goals are addressed, among them comprehensive resource planning through a regional planning process is emphasized; assessment of water availability, use, and demand is recognized as necessary for long term planning, together with an inventory of

---

[12] In 1993, chapter 90.22 RCW was amended to require that Ecology, in cooperation with Indian tribes and the Department of Fish and Wildlife, establish priorities for evaluation of instream flows, with primary focus on wild salmonid production. Plainly, the legislature continued to place a high value on maintaining instream flows to support fish.

available resources consolidated into one resource data system; and setting out fundamental state water resource policy to assure that waters are fully protected and fully used for greatest benefit to the people of the state. RCW 90.54.010.

And, consistent with the overall goal of preserving natural resources and aesthetic values, among the wide range of beneficial uses to which water may be put that are summarized in the Water Resources Act of 1971 are "fish and wildlife maintenance and enhancement, recreational, . . . and preservation of environmental and aesthetic values." RCW 90.54.020(1).

The 1971 act introduced the exception at issue here. As quoted above, RCW 90.54.020(3) first declares that "[t]he quality of the natural environment shall be protected" and if possible, "enhanced." The subsection then declares that "[p]erennial rivers and streams . . . shall be retained with base flows necessary" to preserve "wildlife, fish, scenic, aesthetic and other environmental values, and navigational values" and "[l]akes and ponds shall be retained substantially in their natural condition." RCW 90.54.020(3)(a). Next follows the overriding-considerations exception, which states that "[w]ithdrawals of water which would conflict therewith shall be authorized only in those situations where it is clear that overriding considerations of the public interest will be served." *Id.*

Subsequent legislation confirms that minimum flows set by rule continue to be important existing rights, notwithstanding that instream uses often do not produce economic gains. In 1979, the legislature reiterated the principle set out in the Minimum

Water Flows and Levels Act of 1969, RCW 90.22.030, that minimum flows or levels set by rule would be treated like other water rights. RCW 90.03.345 expressly provides priority dates for minimum flows or levels established by rule, stating that "establishment of reservations of water for . . . minimum flows or levels under RCW 90.22.010 or 90.54.040 shall constitute appropriations within the meaning of this chapter with priority dates as of the effective dates of their establishment." RCW 90.03.345. Accordingly, minimum flows or levels, once established, have priority over later acquired appropriative water rights. "This chapter," referred to in RCW 90.03.345 includes the prohibition on impairment of existing water rights in RCW 90.03.010. This statute, which was enacted after RCW 90.54.020, contains no qualifications that suggest the importance of minimum flow rights is diminished by either the "[m]aximum net benefits" or overriding-considerations provisions in RCW 90.54.020(2) and (3)(a).

In 1979, the legislature also made explicit what by then had long been apparent, i.e., that public policy had dramatically changed from what had been true when the water code was first enacted. Unlike the 1917 law that encouraged maximum diversion of water, the legislature stated in 1979:

> It is the policy of the state to promote the use of the public waters in a fashion which provides for obtaining maximum net benefits arising from both diversionary uses of the state's public waters and the retention of waters within streams and lakes in sufficient quantity and quality to protect instream and natural values and rights. Consistent with this policy, the state supports economically feasible and environmentally sound development of physical facilities through the concerted efforts of the state with the United States, public corporations, Indian tribes, or other public or private entities. Further, based on the tenet of water law which precludes wasteful practices

in the exercise of rights to the use of waters, the department of ecology
shall reduce these practices to the maximum extent practicable . . . .

RCW 90.03.005. Obtaining maximum benefits, prudent management of the state's water resources with input of interested entities, preservation of water within streams and lakes as necessary for instream and natural values, and avoidance of wasteful practices are important goals of present water resource management.

Also in 1979, the legislature enacted RCW 90.03.247, which requires that a permit to appropriate water from a stream or other water body for which minimum flows or levels have been established must be conditioned to protect the levels or flows. Thus, this statute, like others, recognizes established minimum flows as water rights equivalent to other existing water rights that cannot be impaired by a subsequent appropriation.

In contrast to the statutory scheme as a whole, and several specific statutes, Ecology's interpretation of RCW 90.54.020(3)(a) would relegate minimum flow water rights to a lesser class of water right than others, with the water subject to reallocation if Ecology decides that reservations for other beneficial uses would make better use of the state's water. If the minimum flows are to be subject to reallocation by way of reservations of water rights under RCW 90.54.050 whenever other beneficial uses are thought to be better, however, more specific direction from the legislature is required. At present, under the water code minimum flows set by rule are appropriations with a priority date as of the date adopted by rule, minimum flows set by rule cannot impair existing rights and subsequent rights cannot impair existing flow right, and permits to

appropriate water from streams with minimum flows set by rule must be conditioned to protect the minimum flows.

Ecology's interpretation and application of the overriding-considerations fails to give minimum flow water rights the protection the legislature has determined is appropriate, and is thus inconsistent with the statutory scheme.[13]

*Extent of Authority under RCW 90.54.020(3)(a)*

We turn now to the parties' disagreement about whether Ecology's interpretation of the exception in RCW 90.54.020(3)(a) incorrectly gives too much discretion and authority to Ecology to reallocate water use. The Tribe contends that Ecology uses the exception as a broad grant of authority. Ecology maintains that the amount of water reserved here is relatively small in terms of overall stream flow and that the statutes,

---

[13] The dissent says that the legislature made clear when enacting the Water Resources Act of 1971 that minimum flows are not greater than competing interests. Dissent at 8. It is unclear what the dissent means. There is no claim in this case that minimum flow rights are greater than other rights. As explained, these rights are treated like other appropriations of water having priority dates.

The dissent suggests that unless we read the overriding-considerations exception to allow for reallocation of water subject to minimum flow rights, we are contravening RCW 90.22.020. However, this statute provides that "[f]lows or levels authorized for establishment under RCW 90.22.010, or subsequent modification thereof by the department" are to be provided through adoption of rules after public hearings for which notice is provided. Nothing in the statute indicates that considerations supporting a modification are any different from the considerations involved in setting minimum flows in the first place and actually the statute's treatment of "subsequent modification" and "establishment" together without distinction shows that the process for modification is the same as for establishing minimum flows in the first place. In addition, the reference to RCW 90.22.010 indicates the same standards apply. Nothing in RCW 90.22.020 suggests the overriding-considerations exception is relevant to the determination to establish or modify minimum flows under RCW 90.22.010. Further, the dissent is thus also incorrect in assuming that under our decision only modifications increasing minimum flow rights are possible.

including the overriding-considerations exception, constrain Ecology's discretion and prevent using the exception as a source of broad authority.

Regardless of the amount of water at issue in this case, Ecology's reading of the statute results in considerable authority to reevaluate and reallocate water through reservations of water from streams with minimum flows set by rule. Indeed, here the 27 water reservations for a wide number of uses could not be used for the year-round beneficial uses specified unless such authority is found under RCW 90.54.020(3)(a).

But the overriding-considerations exception cannot reasonably be read to replace the many statutes that pertain to appropriation of the state's water and minimum flows. Existing statutes govern applications to beneficially use water for the purposes for which the reservations were made here. For example, Ecology determined that noninterruptible water is needed for some domestic exempt wells because, while there is a current provision for exempt wells, the appropriators' right to use the water is subject to rights with priority in time. But exempt wells are provided for by statute and Ecology's actions on applications for exempt wells are clearly set out in the water code—without any provision permitting a "jump to the head of the line" in priority as a result of Ecology's reservations of water and use of the overriding-considerations exception. *See* RCW 90.44.050.[14]

---

[14] The dissent engages in a "factual analysis" intended to show that exempt well uses and rural public water supply systems qualify under a cost-benefit analysis for consideration under the overriding-considerations exception. But the analysis simply shows what is always true—there are hardships attendant to *any* water right with a later priority date and too little water available to satisfy all rights. The dissent also claims that the reallocations of water for exempt well users and rural public water systems should be permitted since they involve only small quantities of

26

Ecology also maintains that some of the water reservations are for uses that would permit homes and other development in rural areas in the basin where other noninterruptible sources of water do not exist. To the extent that Ecology is correct in believing that such development is desirable, we do not believe that the legislature has extended broad authority to Ecology in RCW 90.54.020(3)(a) to make this development possible through water reservations that reallocate water presently allocated for minimum stream flows.

*Economic Gains*

Next, the Tribe says that Ecology's "test" gives controlling weight to projected economic gains from the beneficial uses for which the water reservations are made. Although Ecology recognizes that the legislature sought to preserve the state's natural resources and aesthetic values, in this case its "test" nonetheless seems principally focused on economic impact from the development that the water reservations are intended to encourage, as the Tribe says.

Economic benefits are undoubtedly of importance in allocating available waters for beneficial uses and the Water Resources Act of 1971 expressly states that economic well-being is a broad goal of the act. RCW 90.54.010. Here, though, the specific issue is whether potential economic gains can justify impairment of existing rights resulting from reallocation of water to other beneficial use. The overall statutory scheme does not

---

water and will have little impact on minimum flows. But the overriding-considerations exception is not a grant of general authority to reallocate water subject to existing water rights regardless of whether the impact on minimum flows and instream uses would be substantial or slight.

support the proposition that the economic value of a new use justifies encroachment on *existing* uses, including minimum flows set by rule. The high value placed on minimum flows is not overcome just because economically advantageous uses could be made of the water necessary to satisfy the minimum flow rights.

And, even as to allocation of water not already spoken for, best use of water does not necessarily mean economically beneficial use. Future allocations of water should be "based generally on the securing of the maximum net benefits for the people of the state." RCW 90.54.020(2). "Maximum net benefits shall constitute total benefits less costs including opportunities lost." *Id.* The meaning of "benefits" is clarified by RCW 90.03.005, enacted in 1979, which states in part that

> [i]t is the policy of the state to promote the use of public waters *in a fashion which provides for obtaining maximum net benefits* arising *from both diversionary uses* of the state's public waters and *retention of waters* within streams and lakes in sufficient quantity *to protect instream and natural values and rights.*

(Emphasis added.) "Maximum net benefits" here refers to both diversionary uses, many of which can be quantified in dollars, and also to instream uses, many of which cannot be economically quantified.[15] It follows that the term "maximum net benefits" in RCW 90.03.005 and RCW 90.54.020(2) does not mean economic benefits alone. That more than economic benefits are contemplated is also necessarily the case because RCW 90.54.020 additionally mandates that waters of the state shall be of high quality. RCW

---

[15] How does one put a dollar value on being in the presence of crystal clear water coursing down a steep slope through a rock-lined, moss-edged stream bed among evergreen trees, for example? While commercial uses of the state's instream flows might be made—tourism and paid-for recreation, for example—such uses do not entail the total benefits derived from streams and lakes.

28

90.54.020(3)(b). High quality is also not a benefit from instream flow that is readily subject to dollar valuation.

Thus, economic gains alone do not justify using RCW 90.54.020(3)(a) to reallocate water that is already subject to a minimum flow water right.[16]

The overriding-considerations exception and Ecology's use of it to justify appropriations of water that otherwise could not be approved presents complex issues of water law and policy. We have considered the questions posed in the context of the many relevant provisions of the state water code. Insofar as this case implicates policy determinations about reallocating the water that is presently needed to satisfy minimum flow water rights to other uses to encourage development in rural areas of the Skagit River basin, the policy determinations are for the legislature. If reallocation of instream

---

[16] The dissent says that allowing the reservations for rural public water supply systems and exempt wells is a matter of necessity if rural development and lifestyle is to be possible. In every basin where water is unavailable, the same can be said to be true. The legislature is well aware that water availability is a significant issue. It has enacted numerous laws reaching various aspects of the issue. *See, e.g., Kittitas County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 172 Wn.2d 144, 175, 256 P.3d 1193 (2011) (noting that planning for rural growth requires that water quality and availability be protected under the Growth Management Act, chapter 36.70A RCW (citing RCW 36.70A.020(10), .070(1), .070(5)(c)(iv))); LAWS OF 1997, ch. 443 ("[r]elating to water supply and growth management"), *id.* § 1 (enacted in response to the "need for development of additional water resources to meet the forecasted population growth in the state"; legislative intent is "to direct the responsible agencies to assist applicants seeking a safe and reliable water source for their use"; to be accomplished, *not* through using additional water resources or reallocating water rights, but "through assistance in the creation of municipal interties and transfers, additional storage capabilities, enhanced conservation efforts, and added efficiency standards for using existing supplies"); RCW 43.21A.064(5). Among other things, statutes also describe alternative sources of water. *E.g.*, RCW 90.54.180(2) ("[i]ncreased water use efficiency and reclaimed water" are to be considered as sources of water, with other sources including "conservation, waste water recycling, and impoundment").

flow necessary to meet minimum flow water rights is to be a part of state water policy, it should come by way of legislative action.[17]

We hold that Ecology's Amended Rule reserving water for designated future beneficial is inconsistent with the plain language of RCW 90.54.020(3)(a) and

---

[17] And specifically with regard to the dissent, if the legislature intended Ecology to have authority to reallocate existing water rights to exempt well and rural public water supply systems as a planning tool for future rural development, it would have provided more guidance than the single sentence exception in RCW 90.54.020(3)(a). Moreover, we note that the dissent does not adequately explain why it believes that the reservations for exempt wells and rural public water supply systems may qualify under the overriding-considerations exception but none of the other reservations do.

The dissent claims that minimum flows are not "immutable." Dissent at 3. The dissent maintains that we have previously approved action by Ecology that impinged on existing prior appropriations when setting minimum flows and therefore, the dissent urges, Ecology may also impinge on minimum flows since they are to be treated like other prior appropriations. Dissent at 3 (citing *Pub. Util. Dist. No. 1*, 146 Wn.2d at 817-18).

The dissent incorrectly reads *Public Utility District No. 1*. The case involved a hydroelectric utility district's application to amend its federal license to allow power generation. Under federal law and state law implementing federal law, the district had to obtain Ecology's approval of a "§ 401 certification" that the project complied with the federal Clean Water Act. Ecology issued the certificate but conditioned it on maintenance of additional minimum flows in order to meet state and federal standards prohibiting degradation of state waters that would interfere with or injure existing beneficial uses, i.e., fish habitat, recreational use, and aesthetics. Degradation can occur as a result of reduced stream flow that affects the physical or biological integrity of the water, and if this happens reduced stream flow constitutes pollution under state and federal law. In *Public Utility District No. 1*, reduced stream flow would have occurred that would affect fish spawning and other instream uses because the project involved a three and one-half mile bypass reach. Ecology acted within its authority under the Clean Water Act to prevent and control this kind of pollution by imposing conditions on certification, as established by *Public Utility District No. 1 of Jefferson County v. Washington Department of Ecology*, 511 U.S. 700, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994) (*Elkhorn* II) and the legislature's grant of authority to Ecology "take all action necessary to . . . meet" the requirements of the Clean Water Act. RCW 90.48.260(1).

In short, the regulatory scheme at issue was entirely separate from the statutes that govern appropriations of water, including appropriations for minimum flows. The legislature has expressly distinguished between minimum flows under chapters 90.03, 90.22, and 90.54 RCW, and instream flow conditions in a § 401 certification under the Clean Water Act and the Water Pollution Control Act, chapter 90.48 RCW. *Pub. Util. Dist. No. 1*, 146 Wn.2d at 820-21.

inconsistent with the statutory context and the entire statutory scheme. It is therefore in excess of Ecology's authority and invalid.

In light of our determination that the Amended Rule is invalid, we do not reach additional issues raised.

## CONCLUSION

RCW 90.54.020(3)(a) provides that perennial streams and rivers must be retained with base flows sufficient to preserve fish and wildlife, scenic, aesthetic and other environmental values, and navigation. A narrow exception is found in the statute that permits impairment of minimum flows set by rule in situations where it is clear that overriding considerations of the public will be served. This exception does not permit the Department of Ecology to reassess the relative merits of uses and reallocate water that is needed to maintain the instream flows through reservations of water for future beneficial uses. Accordingly, Ecology's Amended Rule, which made 27 reservations of water for out-of-stream year-round noninterruptible beneficial uses in the Skagit River basin and which would impair minimum flows set by administrative rule, exceeded Ecology's authority because it is inconsistent with the plain language of the statute and is inconsistent with the entire statutory scheme.

The Amended Rule is invalid.

Madsen, C.J.

WE CONCUR:

_____       _____
Johnson, J.                     Stephens, J.

_____       _____
Owens, J.                      

_____       _____
Fairhurst, J.                 González, J.

_____

No. 87672-0

WIGGINS, J. (dissenting in part)—Our task today is to determine the meaning of the overriding consideration of the public interest (OCPI) standard. But rather than engaging with the statutory text, the legislative history, or the facts of this case, the majority relies on the general contours of the prior appropriation principle of water allocation. *Because* minimum flows constitute a vested water right, the majority reasons, the OCPI *exception* to vested water rights does not apply. This theory not only borders on the tautological, but fails to provide meaningful guidance on the statutory scheme. In other words, the majority explains why not every beneficial use will necessarily constitute an OCPI, but never explains why *no* beneficial use can ever be an OCPI. Specifically, the majority does not explain why a significant benefit to communities underserved by existing water supplies, with a minimal impact on instream flows, cannot be an OCPI. The legislative history of the Water Resources Act of 1971 (hereinafter WRA) (chapter 90.54 RCW) indicates that the majority is reading the OCPI exception too narrowly, and the Department of Ecology's data indicate that the critical water needs of rural and exempt-well users can be served with a very minor reservation. Therefore, I dissent in part.[1]

---

[1] I contest the majority's holding only as to the 1.17 to 1.5 cubic feet per second (cfs) reserved for exempt-well users and rural public water systems, as described below. The majority correctly invalidates the remaining 23.5 cfs of reservations created by the amended instream flow rule (Amended Rule) (*see* majority at 3 n.2).

I.   Statutory analysis

The minimum flow levels on which the majority relies exist by virtue of the Minimum Water Flows and Levels Act of 1969, chapter 90.22 RCW (hereinafter MWFLA). The MWFLA does not exist in a vacuum, nor does it establish nigh-unconditional protection over minimum flows as the majority reads it to do. Majority at 2 ("The exception is very narrow, however, and requires extraordinary circumstances before the minimum flow water right can be impaired."). The reality is more complex: the legislature almost immediately revisited the MWFLA in order to temper its effects when it passed the WRA.

The relevant sections, RCW 90.22.010 through .030, were enacted in 1969. LAWS OF 1969, 1st Ex. Sess., ch. 284, §§ 3-5. In the same year, the legislature established the Legislative Committee on Water Resources to develop provisions for the expansion of agricultural irrigation as well as other present and reasonably foreseeable water needs. Substitute H. Con. Res. 15, 41st Leg., Ex. Sess. (Wash. 1969) (on file with Wash. State Archives). The committee examined the MWFLA and determined that

> if state government is to reserve waters for one use . . . , it is obligated then to reserve for all beneficial uses, and that such reservation procedures place said beneficial uses on a par, i.e., that all uses receive consideration in a single planning and reservation process.

LEGIS. WATER RESOURCES COMM., FINAL REPORT OF FINDINGS TO 42D LEGISLATURE PURSUANT TO PROVISIONS OF SUBSTITUTE H. CON. RES. 15, cmt. at 6 (Jan. 1971) (on file with Wash. State Archives). That is, the committee understood minimum flows to constitute only one of many beneficial uses to be considered "on a par"

2

with one another. Four members of the committee went on to author the bill that became the WRA. Significantly, the OCPI exception was adopted unchanged. *Compare* Engrossed H.B. 394, § 2(3)(a), 42d Leg., 1st Ex. Sess. (Wash. 1971), *with* RCW 90.54.020(3)(a).

In short, the fact that the drafters of the WRA specifically named the MWFLA in their report, as well as the proximity in time of the two enactments, places it beyond dispute that the WRA was meant to modify or clarify the mandates of the MWFLA in some way. And the drafters' own words indicate that when they authored the very same OCPI language that we now interpret, their intent was to secure equitable treatment for minimum flows and for competing water interests. FINAL REPORT OF FINDINGS TO 42D LEGISLATURE, *supra*, cmt. at 6.

Furthermore, the fact that minimum flows constitute vested appropriations of water does not make them immutable.[2] As this court has recognized, Ecology may impinge on extant water rights in the course of *setting* minimum flows. *Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology*, 146 Wn.2d 778, 817-18, 51 P.3d 744 (2002).[3] If Ecology may impinge on prior appropriations through

---

[2] This analysis assumes that the minimum flows created by the instream flow rule (Rule) can be thought of as vested rights in the first place. The amendments to the Rule came about as a direct result of an Administrative Procedure Act, chapter 34.05 RCW, challenge to the Rule. This judicial challenge put the original minimum flows under a cloud of doubt that was only resolved when the litigation settled as a result of Ecology's Amended Rule. Of course, Ecology may not reach a rule through settlement that it could not lawfully reach through the rule making process. But the majority's reliance on the vested nature of prior appropriations evades the key question of how we are to interpret the OCPI exception.

[3] As the majority notes, *Public Utility District No. 1* addressed a different statutory scheme from the minimum flows at issue here. Majority at 31 n.18 (citing *Pub. Util.*

3

rule making in one context, and minimum flows are to be treated as any other prior appropriation, then it stands to reason that Ecology may impinge on minimum flows by rule in some circumstances. We should look to the legislative history, and to the MWFLA's specific provisions for the "subsequent modification" of minimum flow rules, to determine what circumstances justify modification. RCW 90.22.020. If we accept the majority's strict reading of the OCPI exception, then Ecology's statutory authority to modify minimum flows is really only statutory authority to *increase* the minimum flows because there will be so few situations in which Ecology may *decrease* the minimum flows. There is no evidence that the legislature intended the water statutes to work as a one-way ratchet, and such an interpretation flies in the face of the legislature's clearly expressed intent to treat minimum flows and other beneficial uses equally.

II.  Factual analysis

In light of the legislature's intent to place all beneficial uses "on a par," it is puzzling that the majority does not engage with the record, let alone with Ecology's hydrological analysis. Doing so reveals that a reservation as small as 1.5 cfs for exempt-well users and rural public water systems would avoid significant costs on behalf of these underserved communities and would have

---

*Dist. No. 1*, 146 Wn.2d at 820-21). This is a distinction without a difference: the essential holding of *Public Utility District No. 1* is that in some cases, Ecology may override a prior appropriation through rule making. 146 Wn.2d at 821. The majority's assertion that prior appropriations are, essentially, an *absolute* barrier to Ecology's rule making power is more akin to the dissent in *Public Utility District No. 1*. *Id.* at 836-37 (Sanders, J., dissenting).

4

little if any impact on environmental and aesthetic interests. Such an unequivocal net benefit comports with a plain reading of the term "overriding."

In the absence of a prior interpretation of the language "overriding consideration of the public interest," I proceed with a textual analysis. First, we must identify a "consideration of the public interest," and then we must determine whether that consideration "overrides" all competing considerations. That is, we must determine whether the benefit to the public interest from a given reservation would "dominate or prevail over" the associated costs. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1609 (2002) (defining "override"). Of course, costs and benefits may be commensurable or incommensurable. But the very existence of the OCPI exception indicates that there will be *some* cases in which the combined benefits will *so clearly* override the combined costs that an exception to the prior appropriation rule will be warranted.

Many of the new reservations under the Amended Rule, indeed, do not rise to that standard. The Amended Rule would allocate 5.5 cfs to large public water purveyors, at an estimated benefit of $104,000. Administrative Record (Admin. R.) at 002868. The Amended Rule would allocate 10 cfs for agricultural irrigation, at an estimated benefit of $3.7 million. *Id.* at 002869, 002871. The Amended Rule would allocate 0.5 cfs of water for stock watering purposes at "no cost and no gain" to the public. *Id.* at 002872. While Ecology did not calculate individual cost estimates for these reservations, it estimated that the economic costs (mostly comprising impacts on migratory fish populations) of the full 25 cfs reservation would be $6 to $6.7 million. *Id.* at 002880. Even the sum of all the economic

5

benefits of the above three reservations is less than this cost figure. The economic costs are so great that we may conclude that the reservations for large public water purveyors, agricultural irrigation, and stock watering are not overriding considerations of the public interest, without resort to incommensurable costs and benefits.

But the final reservation category—rural public water systems and permit-exempt wells—deserves a closer look. According to Ecology's estimates, 9,766 people relied on permit-exempt wells in 2005, a figure that will increase to 17,501 by 2025. These people will require an additional 0.81 cfs to serve average household needs. Rural public water systems will require an additional 0.36 and 0.69 cfs between now and 2025. In total, then, these needs could be met with a reservation of 1.5 cfs or less. This is less than 1 percent of the 200 cfs of interruptible water rights created by the instream flow rule (Rule)[4] and less than 0.03 percent of the Skagit River's average flow during the dry season.[5]

Now consider the alternative. Without these 1.5 cfs, rural public water system or exempt-well users are left without water for up to 20 days of some months and are left with a few onerous choices. One choice, according to Ecology's cost benefit analysis, is to store sufficient water to last through the dry season. This would require about three months' worth or tens of thousands of

---

[4] *See* majority at 3 n.2.

[5] During the low flow season in the early fall, the Skagit River Watershed averages 5,970 cfs. The average flow for the whole year is 16,560 cfs, over 11,000 times the amount of water needed by rural public water system and exempt-well users.

gallons. Secondly, users might purchase agricultural farmland with uninterruptible water rights and transfer the rights to their homes, thus reducing the State's supply of irrigated farmland. A third choice is to develop an Ecology-approved mitigation plan, which would require a hydrological analysis; professional hydrological investigation may be very expensive.[6] Finally, if none of these options is feasible, users may be left with no choice but to abandon their land, downgrading building lots to pieces of dry farmland. In total, the costs that would be avoided by a 1.5 cfs reservation for rural public water system and exempt-well users *alone* would be in excess of $29 million.

The interests on the other side of the equation include incommensurables such as fish spawning and recreational enjoyment of the waters of the Skagit River. To be sure, these are important interests that Ecology is not at liberty to ignore. And indeed, Ecology properly took the incommensurables into account and incorporated them into its analysis when it determined that the amended instream flow rule (Amended Rule)[7] was supported by OCPI. Ecology determined in its expert capacity that the full 25 cfs reservation provided by the Amended Rule would decrease the populations of chinook, coho, cutthroat, and other perennially spawning fish by 0.5 percent.[8] Surely the impact would be even less if

---

[6] The town of Hamilton's Little Carey's Creek mitigation plan, for instance, cost over $750,000.

[7] *See* majority at 3 n. 2.

[8] Ecology estimates that fish that spawn in the late fall and depart for the ocean by spring, such as pink, chum, and fall chinook, would not be affected at all.

we reduced the reservation 16-fold, limiting Ecology to the 1.5 cfs necessary for rural public water system and exempt-well users.[9] Furthermore, there are incommensurables in favor of the Amended Rule as well. As Ecology notes in its brief, the reservations created by the Amended Rule are not merely a matter of economic benefit but rather a matter of necessity to make rural development and lifestyles in the Skagit River basin possible at all.

The majority argues that Ecology categorically may not rely on cost-benefit analysis in determining OCPI, for fear that "the need for potable water for rural homes [will be] virtually assured of prevailing over environmental values." Majority at 14. No party has called for such an inflexible test, and neither do I. This is not simply a case where the benefits are greater than the costs but where the benefits of the 1.5 cfs reservation *in particular* are significant and the costs are close to nothing. That is, the record clearly indicates that the 1.5 cfs reservation for rural public water system and exempt-well users would bring significant value to users underserved by traditional water supplies, at a nominal cost to fish populations and other ecological and aesthetic interests. If such an overwhelming benefit does not "override," that is "to dominate or prevail over," the marginal impact on fish, it is difficult to determine what would. WEBSTER'S, *supra*, at 1609. If the OCPI exception were reserved for truly "extraordinary circumstances" as the majority reads it to be, majority at 2, then the legislature could have enumerated such "extraordinary circumstances," such as fires or other emergencies. The

---

[9] If a reservation of 25 cfs is expected to cause as much as $6.7 million in harms to fish populations, Admin. R. at 002880, then simple arithmetic suggests that a reservation of 1.5 cfs will cause less than half a million dollars in damage.

legislature did not do so, and when it passed the WRA, it made clear that minimum flows were to be treated equally with and not greater than competing water interests. It is difficult to square this legislative intent with the majority's willingness to sacrifice significant socioeconomic interests for the sake of a miniscule proportion of a select number of fish populations.

Of course, this court is not a finder of fact. While it seems likely that a reservation of 1.5 cfs would have even less of an impact on environmental and aesthetic interests than would the full 25 cfs envisioned by the Rule—and perhaps even no impact at all—we cannot say for certain. Ecology's hydrological expertise places it in a better position to determine the impact (or lack of impact) of a 1.5 cfs reservation for exempt-well users and rural public water systems. Therefore, I would remand this case with instructions to Ecology to analyze the ecological impact of the 1.5 cfs reservation. If Ecology finds that a reduction of 1.5 cfs would produce benefits to the public interest that clearly override the harms—for instance, a reduction in fish populations of a hundredth of a percent or less—then the reservations should be permitted. If not, then I would agree with the majority.

I respectfully dissent.

_Wiggins, J._

_Chambers, J.P.T._

_J.M. Johnson_