# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

FILMORE LLLP, a Washington limited )   NO. 70013-8-I
liability limited partnership, )
   )   DIVISION ONE
        Respondent, )
   )
        v. )
   )
UNIT OWNERS ASSOCIATION OF )   PUBLISHED OPINION
CENTRE POINTE CONDOMINIUM, )
a Washington nonprofit miscellaneous )   FILED: September 2, 2014
corporation, )
        Appellant. )
_____ )

LAU, J. — This appeal involves a dispute between the Unit Owners Association of

Centre Pointe Condominium (Centre Pointe) and Filmore LLLP over the percentage of

unit owner voter approval needed to pass declaration amendments restricting the

leasing of units.[1] The parties disagree on the meaning of the word "use" in both the

Centre Pointe condominium declaration and the Washington Condominium Act (WCA),

chapter 64.34 RCW. Both of these require 90 percent voter approval for declaration

amendments that change "the uses to which any unit is restricted." RCW 64.34.264(4).

On summary judgment, the trial court invalidated the declaration amendments passed

by 67 percent of the unit owners voting because a restriction on leasing requires 90

---

[1] We use "lease" and "rent" interchangeably in this opinion.

percent approval. Because a restriction on the use of a unit encompasses leasing under the WCA and the original declaration, we affirm the order on summary judgment invalidating the Twelfth Amendment.

## FACTS

The main facts are undisputed. Centre Pointe Condominium is a residential condominium complex in Bellingham, Washington. Its original condominium declaration was recorded in 2003. Centre Pointe is a multi-phased project with each phase consisting of a separate building of residential units. The first three phases (buildings A, B, and C) were constructed and their residential units sold prior to the filing of the complaint in this case. The fourth phase was created and defined as a separate "Development Unit D-3."

From 2003 until the summer of 2012, Article IX of Centre Pointe's condominium declaration governed permitted uses and lease restrictions.

> Permitted Uses; Architectural Uniformity
> 9.1. Permitted Uses.
>     9.1.1. Residential Use.
>     Other than as provided in Section 9.1.2 hereof, the buildings and Units shall be used for residential purposes only, and for common social, recreational or other reasonable uses normally incident to such purposes. . . .
>     . . . .
>     9.1.14. Lease Restrictions.
>     Any lease agreement shall be required and deemed to provide that the terms of the lease shall be subject in all respects to the provisions of the Condominium Instruments, and that any failure by the Lessee to comply with such provisions shall be a default under the lease, entitling the Association to enforce such provisions as a real party in interest. All leases shall be in writing and a copy of each lease must be supplied to the Association. No lease shall have a term of less than one year. Other than the foregoing, there is no restriction on the right of any Unit Owner to lease his or her Unit. Any tenant or subtenant of any portion of a Unit shall be deemed to have assumed all the responsibilities of an Owner under this Section of the Declaration.

(Emphasis added.)

Article XVII of the condominium declaration addresses amendment of the declaration.

> 17.1. <u>Procedure for Amendment of Declaration</u>
> Amendments to the Declaration shall be made by an instrument in writing entitled "Amendment to Declaration which sets forth the entire amendment. . . . [Subject to certain exceptions], amendments may be adopted only at a meeting of the Owners if at least sixty-seven percent (67%) of the votes in the Association are cast for such amendment, or without any meeting if all Owners have been duly notified and Owners holding at least sixty-seven percent (67%) of the votes in the Association consent in writing to such amendment. . . .
> . . . .
> 17.3. <u>Special Restrictions</u>.
> Except to the extent expressly permitted or required by other provisions of this Declaration, or of the Condominium Act, <u>no amendment may create or increase Special Declarant Rights, increase the number of Units, change the boundaries of any Unit, the Allocated Interests of a Unit, or the uses to which any Unit is restricted, in the absence of the vote or agreement of the Owner of each Unit particularly affected and his or her Mortgagee and the Owners of Units to which at least ninety percent (90%) of the votes in the Association are allocated other than the Declarant, and that percentage of Eligible Mortgagees and/or Eligible Insurers specified in Article XV above.</u> No amendment may restrict, eliminate, or otherwise modify any Special Declarant Right provided in the Declaration without the consent of the Declarant and any mortgagee of record with a security interest in the Special Declarant Right or in any real property subject thereto, excluding mortgagees of Units owned by persons other than the Declarant.

(Emphasis added.)

Article XVII mirrors the WCA's provisions for amendment of condominium declarations. Specifically, RCW 64.34.264, entitled "Amendment of declaration," provides in relevant part:

> (1) Except in cases of amendments that may be executed by a declarant under RCW 64.34.232(6) or 64.34.236; the association under RCW 64.34.060, 64.34.220(5), 64.34.228(3), 64.34.244(1), 64.34.248, or 64.34.268(8); or certain unit owners under RCW 64.34.228(2), 64.34.244(1), 64.34.248(2), or 64.34.268(2), and except as limited by subsection (4) of this section, the declaration, including the survey maps and plans, may be amended only by vote

or agreement of unit owners of units to which at least sixty-seven percent of the votes in the association are allocated, or any larger percentage the declaration specifies: PROVIDED, That the declaration may specify a smaller percentage only if all of the units are restricted exclusively to nonresidential use.

. . . .

(4) Except to the extent expressly permitted or required by other provisions of this chapter, no amendment may create or increase special declarant rights, increase the number of units, change the boundaries of any unit, the allocated interests of a unit, or the uses to which any unit is restricted, in the absence of the vote or agreement of the owner of each unit particularly affected and the owners of units to which at least ninety percent of the votes in the association are allocated other than the declarant or such larger percentage as the declaration provides.

. . . .

(6) No amendment may restrict, eliminate, or otherwise modify any special declarant right provided in the declaration without the consent of the declarant and any mortgagee of record with a security interest in the special declarant right or in any real property subject thereto, excluding mortgagees of units owned by persons other than the declarant.

(Emphasis added.)

Filmore LLLP is a Washington limited liability limited partnership. Filmore purchased Unit D-3 (subject of Centre Pointe's fourth development phase) in May 2011 after the bank foreclosed on a prior owner of the unit. After purchasing unit D-3, Filmore secured a commercial loan from Peoples Bank for over $3.6 million to finance construction of new residential units. This loan was secured by a deed of trust on Unit D-3. In September 2012, the condominium documents were recorded to divide Unit D-3 into 35 individual residential units.

Meanwhile, in October 2011, after Filmore purchased Unit D-3 and before it recorded the condominium documents, Centre Pointe's unit owner's association (the Association)[2] adopted the Twelfth Amendment of the declaration. It amended section

---

[2] We refer to "the Association" and "Centre Pointe" interchangeably in this opinion.

-4-

70013-8-I/5

9.1.14 quoted above "To instill limits on the total number of condominium units that can be rented or leased."[3] The amendment stated, "[P]ursuant to RCW 64.34.264 and Section 17.1 of the Declaration, the Declaration of this Condominium may be amended by the vote or agreement of owners of units to which at least sixty-seven percent (67%) of the votes in the Association are allocated" and declared that "the Association has obtained the necessary consent of the requisite percentage of Unit Owners prior to the date of this Amendment."[4] The amendment was recorded with the Whatcom County Auditor on October 20, 2011.

The Twelfth Amendment changed section 9.1.14 of the original declaration by imposing new restrictions, exemptions, classes of owners, and other details restricting all unit owners' ability to lease their units. The changes include

- limiting leases to 30 percent of the total number of condominium units (section 9.1.14(b)(i));

- creating a distinction between "Owners" and "Investor-Owners" (section 9.1.14(b)(i)); (3) creating a hardship exemption to the leasing restriction granting the board of directors discretion to approve exemptions (section 9.1.14(b)(ii));

- creating an exemption for existing rentals based on grandfathering (section 9.1.14(b)(iii));

---

[3] The Association's immediate past president, Debbie Haddad, testified in her declaration that the Association's purpose in adopting the Twelfth Amendment was to maintain market values of existing units and make it easier for owners to sell their units. She testified, "The FHA and lenders have guidelines under which their funds' willingness to make or guarantee loans is decreased or nonexistent if there is extensive leasing at a condominium."

[4] Haddad testified in her declaration, "Through the Association's management company, the proposed 12th amendment was submitted to the owners for a vote. It received a 'yes' vote from more than 67% of the voting interests in the condominium."

- creating an exemption for rentals incident to bona fide sale of a unit (section 9.1.14(b)(iv));

- creating an exemption to the Association after foreclosure of an assessment lien and to institutional lenders after foreclosure of a first mortgage (section 9.1.14(b)(v));

- creating an exemption from the restriction if the lease is to immediate family members (section 9.1.14(b)(v)).

In October 2012, Filmore filed a complaint for "violation of statute, breach of declaration, declaratory action and damages." (Capitalization omitted.) Filmore alleged that Centre Pointe's adoption of the Twelfth Amendment violated the WCA and Centre Pointe's condominium declaration. In January 2013, Filmore moved for summary judgment, requesting the court to conclude that the declaration's Twelfth Amendment is void as a matter of law. In its memo supporting summary judgment, Filmore argued that lease restrictions constitute a restriction on "use" requiring a 90 percent approval vote under RCW 64.34.264(4) and the declaration.

On February 8, 2013, the trial court granted Filmore's summary judgment motion. The court's order states, "[T]he Twelfth Amendment to the Declaration is void and shall not be enforceable for lack of 90% voter approval." Centre Pointe moved for RAP 2.3(b)(4) certification. The trial court certified one question for discretionary review.

> [W]hether the Twelfth Amendment [to Centre Pointe's declaration], which imposed a cap on the number of condominium units . . . that can be leased by owners to tenants, "changes . . . the uses to which a unit is restricted" and would therefore require approval by 90% or more of the voting power of the condominium owners' association, rather than approval by 67% of such voting power, under the Washington Condominium Act, see RCW 64.34.264, and/or the [declaration].

See correspondence file (Appendix A to Centre Pointe's motion for extension of time to file motion for discretionary review (trial court's order granting Centre Pointe's motion for

certification)). We granted Centre Pointe's motion for discretionary review on that limited issue. See correspondence file (ruling on discretionary review).[5]

## ANALYSIS

### Standard of Review

In this case we review a summary judgment order involving the interpretation of a statute and a condominium declaration. We review a summary judgment order de novo, engaging in the same inquiry as the trial court. Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). Summary judgment is warranted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). Similarly, questions of statutory construction are reviewed de novo. State v. Votava, 149 Wn.2d 178, 183, 66 P.3d 1050 (2003). "A condominium declaration is like a deed, the review of which is a mixed question of law and fact." Lake, 169 Wn.2d at 526. The factual issue is the declarant's intent, which we discern from the face of the declaration; the declaration's legal consequences are questions of law we review de novo. Lake, 169 Wn.2d at 526.

### Washington's Condominium Act

Washington's Condominium Act, chapter 64.34 RCW, was enacted in 1989 and governs all condominiums created after July 1, 1990 (including Centre Pointe). RCW 64.34.010. The WCA requires condominium declarations to contain certain elements such as the name of the condominium, a legal description of the real property included in the condominium, and, relevant to this case, "[a]ny restrictions in the declaration on

---

[5] We do not address the meaning of "use" in the WCA or the declaration with respect to other activities or in other contexts.

use, occupancy, or alienation of the units." RCW 64.34.216(1)(n). The declaration "may contain any other matters the declarant deems appropriate." RCW 64.34.216(3).

Percentage Approval for Twelfth Amendment

The certified question in this case turns on whether the language "the uses to which any unit is restricted," in RCW 64.34.264(4) and the Centre Pointe declaration encompasses leasing as a "use" of the property. Centre Pointe contends that "use" refers only to residential versus nonresidential. Thus, leasing restrictions are subject to a 67 percent vote, not 90 percent, because they are not restrictions on "use." Filmore contends that leasing constitutes a "use" of the property. Thus, a lease restriction via declaration amendment requires a 90 percent vote.

"All condominiums are statutorily created." Shorewood W. Condo. Ass'n v. Sadri, 140 Wn.2d 47, 52, 992 P.2d 1008 (2000). Because condominiums are creatures of statute, "the rights and duties of condominium unit owners are not the same as those of real property owners at common law." Shorewood, 140 Wn.2d at 53.

> The property rights that owners of individual condominium units have in the units are creations of the condominium statute and are subject to the statute, the declaration, the bylaws of the condominium association, and lawful amendments of the declaration and bylaws. An association may apply a restriction on leasing, if adopted in accordance with statute, to current owners.

Shorewood, 140 Wn.2d at 54 (emphasis added).[6] We first consider whether the Association acted in accordance with the statute by adopting restrictions on leasing with 67 percent approval rather than 90 percent approval.

---

[6] For this reason, we reject Filmore's assertion that "this case can and should be decided upon the specific language of the Declaration, and not upon interpretation of the Act." Resp't's Br. at 14.

When construing a statute, our goal is to determine and effectuate legislative intent. Swinomish Indian Tribal Cmty. v. Dep't of Ecology, 178 Wn.2d 571, 581, 311 P.3d 6 (2013). We give effect to the plain meaning of the language used as the embodiment of legislative intent. Swinomish, 178 Wn.2d at 581. "We determine plain meaning 'from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question.'" Swinomish, 178 Wn.2d at 581 (internal quotation marks omitted) (quoting Trac-Fone Wireless, Inc. v. Dep't of Revenue, 170 Wn.2d 273, 281, 242 P.3d 810 (2010)). We read the statute as a whole to give effect to all language used. In re Pers. Restraint of Skylstad, 160 Wn.2d 944, 948, 162 P.3d 413 (2007). "If the statute is unambiguous after a review of the plain meaning, the court's inquiry is at an end."[7] Lake, 169 Wn.2d at 526.

The term "use" is undefined in the WCA. "In the absence of a specific statutory definition, words in a statute are given their common law or ordinary meaning." State v. Chester, 133 Wn.2d 15, 22, 940 P.2d 1374 (1997); see also Lake, 169 Wn.2d at 528. To determine the plain meaning of a term undefined by statute, the court first looks at the dictionary definition. State v. Kintz, 169 Wn.2d 537, 547, 238 P.3d 470 (2010). The dictionary defines "use" as "the legal enjoyment of property that consists in its employment, occupation, exercise, or practice," "a particular service or end: purpose, object, function," and "the quality of being suitable for employment: capability of filling a need or promoting an advantage: usefulness, utility." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2523 (2002). "Use" is also defined as "[t]he application or

---

[7] Neither party argues that the statute is ambiguous. Rather, they advance different unambiguous interpretations.

employment of something; esp., a long-continued possession and employment of a thing for the purpose for which it is adapted, as distinguished from a possession and employment that is merely temporary or occasional." BLACK'S LAW DICTIONARY 1681 (9th ed. 2009). The plain meaning of "use" as defined in the dictionary is broad.

Centre Pointe advances several arguments in support of its contention that the term "use" in RCW 64.34.264(4) excludes leasing. Despite surface appeal, Centre Pointe's narrow and hypertechnical interpretation of the statute is unpersuasive.

First, Centre Pointe cites to a rental cap agreement for an unrelated condominium drafted by counsel different from the attorney who drafted the leasing restriction for Centre Pointe. That rental cap agreement states, "'The uses to which any unit is restricted,' as the phrase is used in Section 17.3 of the Declaration, means a restriction based on a land use classification of residential or non-residential . . . . " Centre Pointe contends that the above-quoted rental cap agreement accurately identifies the meaning of the word "use" in this case. But an attorney's opinion as to the proper definition of "use" sheds no light on legislative intent.

Centre Pointe also points to two statutory provisions governing the disclosures required of the declarant to purchasers in the public offering statement and the required content of a declaration. RCW 64.34.410(1), which addresses condominium public offering statements, refers to use restrictions separately from leasing restrictions. It provides:

> A public offering statement shall contain the following information:
>  . . .
> (g) A brief description of the permitted uses and use restrictions pertaining to the units and the common elements;

     (h) A brief description of the restrictions, if any, on the renting or leasing of units by the declarant or other unit owners, together with the rights, if any, of the declarant to rent or lease at least a majority of units.

RCW 64.34.410(1). And RCW 64.34.216(1)(n) provides, "The declaration for a condominium must contain . . . [a]ny restrictions in the declaration on use, occupancy, or alienation of the units. Centre Point contends that both provisions show that "use" has a different meaning than "leasing." However, neither statutory provision qualifies or limits the meaning of "use." Although Centre Pointe asserts that leasing restrictions are a restraint on alienation rather than a restraint on use, this question remains unsettled.[8] We are not persuaded that these statutory provisions indicate a legislative intent to exclude leasing from the meaning of "use" in RCW 64.34.264(4).

     Center Pointe also relies on several other WCA provisions in which "use" is qualified by "residential" or "nonresidential." Centre Pointe claims that these provisions

---

     [8] Sources differ on whether leasing restrictions are restrictions on use or alienation. See ZACHARY M. RAWLING, Reevaluating Leasing Restrictions in Community Associations: Rejecting Reasonableness in Favor of Consent, 5 J.L. Econ. & Pol'y 223, 232 (2009) (treating leasing restrictions as restrictions on alienation); Shorewood W. Condo. Ass'n v. Sadri, 92 Wn. App. 752, 759, 966 P.2d 372, rev'd, 140 Wn.2d 47, 992 P.2d 1008 (2000) (citing persuasive and foreign authority for the proposition that "[r]estrictions on leasing have been upheld as reasonable restraints on alienation") (but this language was not included in the Supreme Court's reversal of this decision in Shorewood); Breezy Point Holiday Harbor Lodge-Beechside Apt. Owners' Ass'n v. B.P. P'ship, 531 N.W. 2d 917, 919 (Minn. App. 1995) ("At least one other jurisdiction, however, has upheld a rental restriction as a valid restriction on the use of property and not a restraint on alienation."); Holiday Out in Am. at St. Lucie, Inc. v. Bowes, 285 So.2d 63, 64-65 (Fla. App. 1973) (provision granting condominium developer exclusive right to rent units and prohibiting other owners from such rentals upheld as valid restriction on use of units); ELIZABETH WILLIAMS, CAUSE OF ACTION TO ENFORCE, OR DECLARE INVALID, RESTRICTION ON USE OF CONDOMINIUM PROPERTY, 14 Causes of Action 2d 315, § 19 (2000) (citing cases for the principle that the power of alienation is only affected when an owner cannot convey title in absolute fee and that restriction on leasing affects only the use of units, not the right to alienate units). We need not decide whether leasing restrictions are restraints on alienation under Washington law.

show that the legislature intended "use" to refer only to the distinction between residential versus nonresidential uses throughout the entire statute.[9] But RCW 64.34.264(4), which provides that 90 percent approval is required for declaration amendments that change "the uses to which any unit is restricted," is not among the statutory provisions that qualify the word "uses" with "residential" or "nonresidential." Other provisions in the WCA similarly refer to "use" without specifying residential or nonresidential. See RCW 64.34.443(1)(a) (any written affirmation of fact or promise "which relates to the unit, its use, or rights appurtenant thereto . . . or the right to use or have the benefit of facilities not located in the condominium creates an express warranty that the unit and related rights and uses will conform to the affirmation or promise") (emphasis added); RCW 64.34.443(1)(d) ("A written provision that a buyer may put a unit only to a specified use is an express warranty that the specified use is

_____

[9] See RCW 64.34.216(1)(e) ("The data described in (ii), (iii), and (iv) of this subsection (1)(e) may be omitted with respect to units restricted to nonresidential use"); RCW 64.34.264(1) (special provisions for "units . . . restricted exclusively to nonresidential use"); RCW 64.34.268(1) (special provisions for units "restricted exclusively to nonresidential uses"); RCW 64.34.348(1) (same); RCW 64.34.352(8) (special provisions if "all units of a condominium are restricted to nonresidential use"); RCW 64.34.380(4) (certain sections apply to condominiums "intended in whole or in part for residential purposes" and do not apply to condominiums "consisting solely of units that are restricted in the declaration to nonresidential use"); RCW 64.34.400(1) (exception for "those units that are restricted to nonresidential use in the declaration"); RCW 64.34.415(2) (section applies "only to condominiums containing units that may be occupied for residential use"); RCW 64.34.440(2) (referring to units "occupied for residential use" and excluding units that "will be restricted exclusively to nonresidential use"); RCW 64.34.440(6)(f)(i) (referring to work done to maintain the building or lot for "the residential use of the existing tenants"); RCW 64.34.445(3) (addressing warranties "to a purchaser of a unit that may be used for residential use that an existing use, continuation of which is contemplated by the parties, does not violate applicable law"); RCW 64.34.450(1), (2) (addressing warranties of quality for "units intended for nonresidential use" and "units intended for residential use).

lawful.") (emphasis added); RCW 64.34.445(2) (declarant and dealer warrant that unit and common elements are "suitable for the ordinary uses of real estate of its type . . .") (emphasis added); RCW 64.34.445(3) (declarant and dealer warrant to purchaser of unit that may be used for residential use that "an existing use, continuation of which is contemplated by the parties, does not violate applicable law . . . .") (emphasis added). As noted above, the legislature could have—but did not—define the term "use" in any form or context in the WCA.[10]

Our review of the WCA indicates that where the legislature used "residential" or "nonresidential" to describe the word "use," such reference relates to differences in requirements for notice, voting percentages, insurance, the public offering statement, warranties, and reserve accounts—all of which are reasonable distinctions to make given the WCA's strong emphasis on protecting residential buyers of condominiums.[11]

---

[10] Commentators have described the WCA as "precisely drafted." 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE TRANSACTIONS § 12.4, at 29 (2d ed. 2004). Presumably the legislature's omission of a definition narrowing "use" to residential or nonresidential was intentional.

[11] See One Pac. Towers Homeowners' Ass'n v. HAL Real Estate Invs., Inc., 148 Wn.2d 319, 330-31, 61 P.3d 1094 (2002) (one of the main purposes of the WCA is to provide protection for condominium purchasers); Washington Condominium Act Official Comments to RCW 64.34.410 (comment 1) ("The best 'consumer protection' that the law can provide to any purchaser is to ensure that such purchaser has an opportunity to acquire an understanding of the nature of the products which it is purchasing."); Washington Condominium Act Official Comments to RCW 64.34.950 ("This Act should be construed in accordance with its underlying purpose of making uniform the law with respect to condominiums, as well as the purposes stated in the Prefatory Note of simplifying, clarifying, and modernizing the law of condominiums, promoting the interstate flow of funds to condominiums, and protecting consumers, purchasers and borrowers against condominium practices which may cause unreasonable risk of loss to them.").

Such distinctions do not necessarily mean the legislature intended the word "uses" in RCW 64.34.264(4) to refer solely to residential or nonresidential.

Center Pointe next contends that Filmore's interpretation of the term "use" would make RCW 64.34.264(4) apply indiscriminately so that the 90 percent exception for "uses to which any unit is restricted" would swallow the general 67 percent rule for amendments to condominium declarations. We are not presented with that speculative circumstance here. As noted above, our resolution is limited to the certified question presented on discretionary review—whether the legislature intended to exclude leasing from those "uses to which any unit is restricted" in RCW 64.34.264(4). Accordingly, we express no opinion as to whether or to what extent other types of uses are subject to the 90 percent approval requirement.

In sum, we are not persuaded that the legislature intended to narrow the term "uses" in RCW 63.34.264(4) to solely residential versus nonresidential. This interpretation conflicts with common sense and the word's plain meaning. See Prison Legal News, Inc. v. Dep't of Corr., 154 Wn.2d 628, 637 n.7, 115 P.3d 316 (2005) (rejecting amicus brief argument that attempted to narrow definition beyond plain meaning of statutory term); Rettkowski v. Dep't of Ecology, 128 Wn.2d 508, 515-16, 910 P.2d 462 (1996) (rejecting Department's attempt to narrow the scope of a statute by reading the term "any" as a limiting word); Sacred Heart Med. Ctr. v. Dep't of Revenue, 88 Wn. App. 632, 637-38, 946 P.2d 409 (1997) (rejecting Department's overly narrow interpretation on ground it conflicted with statute's plain meaning as derived from dictionary definition). "[A] statute which is clear on its face is not subject to judicial interpretation." In re Marriage of Kovacs, 121 Wn.2d 795, 804, 854 P.2d 629 (1993).

-14-

The plain meaning of "use," derived from the dictionary, undermines Centre Pointe's arguments. "Undefined common statutory terms are given their common dictionary meanings unless there is strong evidence the legislature intended something else." Michaels v. CH2M Hill, Inc., 171 Wn.2d 587, 601, 257 P.3d 532 (2011). Under the circumstances here, the common ordinary meaning of "use" applies because no evidence indicates the legislature intended something else.

Although we conclude that "the uses to which any unit is restricted" under RCW 64.34.264(4) unambiguously includes leasing, we also reviewed the available legislative history including the legislative bill reports, official comments to the WCA, the Uniform Common Interest Ownership Act (UCIOA), and its official comments.[12] Legislative

---

[12] The WCA "substantially adopted the major provisions of the Uniform Common Interest Ownership Act . . . ." Park Ave. Condo. Owners Ass'n v. Buchan Devs., L.L.C., 117 Wn. App. 369, 374, 71 P.3d 692 (2003). In Marina Cove Condominium Owners Ass'n v. Isabella Estates, 109 Wn. App. 230, 241, 34 P.3d 870 (2001), abrogated on other grounds by Satomi Owners Ass'n v. Satomi, LLC, 167 Wn.2d 781, 225 P.3d 213 (2009), which was also decided under the WCA, we looked to the UCIOA's official comments to determine the legislature's intent. Our Supreme Court has noted:

> Other state courts have also turned to the official comments to interpret their versions of the Uniform Act. See Griffith v. Faltz, 162 Ariz. 599, 600, 785 P.2d 119 (1990) ("Although this court is not bound by the interpretation of the Commissioners on Uniform State Laws, that interpretation is highly persuasive and should be adopted unless it is erroneous or contrary to the settled policy of the state."); State v. Rupe, 109 N.C. App. 601, 613–14, 428 S.E.2d 480 (1993) (stating, "Although the commentary is not binding when not enacted into law, where proper, it may be given substantial weight in discerning legislative intent.").

One Pac., 148 Wn.2d at 328.

The official comments to the UCIOA help little with our analysis. The comments show that the UCIOA drafters were concerned about what "use" meant. It explains that "use" might encompass such activities as pet ownership. But the official comments to the WCA are much briefer and omit much of the UCIOA analysis. The WCA official comments fail to address the term "use" or attempt to explain what activities constitute a "use" under the statute. The UCIOA and the WCA also differ in their statutory language in several material respects.

history may be of some interest even where the court concludes that the statute's plain language is unambiguous. Scott v. Cascade Structures, 100 Wn.2d 537, 544, 673 P.2d 179 (1983). "This is particularly so where the contemporaneous record of a bill's progress bolsters the plain meaning." Lane v. Port of Seattle, 178 Wn. App. 110, 119 n.3, 316 P.3d 1070 (2013). We conclude that nothing in the WCA's legislative history, official comments, or other related materials suggests that the legislature intended to limit "uses to which any unit is restricted" in RCW 64.34.234(4) to residential versus nonresidential uses.[13]

---

[13] The parties submit (1) various attorney/commentator's articles addressing procedural requirements for passage of rental restrictions and (2) competing examples of other condominium declaration amendments that restricted leasing and were passed by either a 67 percent or a 90 percent vote. These authorities serve only to demonstrate that this issue is currently hotly debated and affects all condominium developments, not just Centre Pointe. See Jim Strichartz, How Associations Can Effectively Deal with Unit Rentals (May 2007) http://71.18.246.74/web files/Articles.pdf.

Filmore filed a motion to strike the Association's second supplemental designation of clerk's papers, which consists of a "Declaration of Steven A. Rockey in Support of Defendant's Motion for RAP 2.3(b)(4) Certification." Attached to the declaration were the face page and page 7 from Strichartz's article, attached in its entirety below. This declaration was filed with the trial court on March 6, 2013, nearly a month after the court's summary judgment ruling. The declaration was submitted to support the Association's motion for certification for appeal.

Filmore urges us to strike the second supplemental designation of clerk's papers because (1) the portion of the record included in the second supplemental designation was not part of the record the trial court reviewed when ruling on summary judgment and was submitted to the trial court only in relation to the Association's motion for certification for appeal, (2) the record referenced in the second supplemental designation contains only part of the article and excerpted out sections contrary to the Association's position, and (3) Filmore already submitted its responsive brief and thus had no chance to respond to the issues raised in the article.

In sum, the record contains materials submitted to the trial court after the court made the summary judgment ruling that is now before us on discretionary review. Filmore has moved to strike these materials from the appellate record. Filmore relies on the rule that in reviewing an order granting or denying a motion for summary judgment, this court will consider only evidence and issues called to the attention of the trial court. RAP 9.12. However,

For the foregoing reasons, we reject Centre Pointe's narrow definition of "uses to which any unit is restricted" in RCW 64.34.264(4) where no strong evidence indicates the legislature intended to narrow its meaning beyond the plain or common meaning. We conclude that "the uses to which any unit is restricted" under RCW 64.34.264(4) unambiguously includes leasing. A lease restriction via declaration amendment requires a 90 percent vote. The Twelfth Amendment, which was passed with a 67 percent vote, is inconsistent with the WCA and is therefore invalid.[14]

Condominium Declaration

Centre Point correctly notes that "Section 17.3 of the Center Pointe declaration tracks the text of RCW 64.34.264(4)." Appellant's Br. at 25 (citation omitted). Both the WCA and the declaration provide that no amendment may change "the uses to which

---

a motion to strike is typically not necessary to point out evidence and issues a litigant believes this court should not consider. No one at the Court of Appeals goes through the record or the briefs with a stamp or scissors to prevent the judges who are hearing the case from seeing material deemed irrelevant or prejudicial. So long as there is an opportunity (as there was here) to include argument in the party's brief, the brief is the appropriate vehicle for pointing out allegedly extraneous materials—not a separate motion to strike.

Engstrom v. Goodman, 166 Wn. App. 905, 909 n.2, 271 P.3d 959 (2012).

The rules of appellate procedure allow a party to designate "those clerk's papers and exhibits the party wants the trial court clerk to transmit to the appellate court." RAP 9.6(a). The Association's designation of the record was within this rule. We deny the motion to strike.

[14] We emphasize that even if the statute could be read to limit "use" to residential or nonresidential, individual condominium declarations may specify that a larger percentage than 67 percent is necessary to make general amendments to the declaration. See RCW 64.34.264(1) (setting "at least sixty-seven percent" as the general rule but allowing the declarant to require "any larger percentage the declaration specifies"). As noted above, here the declarant treated leasing as a permitted use and set forth a 90 percent voter approval rule for amendments changing the uses to which units are restricted.

any unit is restricted" in the absence of at least 90 percent of the votes in the association. We further agree with Centre Pointe's assertion that "construction of a paragraph of a declaration is guided by the meaning of the corresponding statute." Appellant's Br. at 25 (citing Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 530-31, 243 P.3d 1283 (2010)). As discussed above, "the uses to which any unit is restricted" under RCW 64.34.264(4) encompasses lease restrictions. Therefore, we conclude that the declaration also mandates a 90 percent vote for amendments that alter leasing restrictions.

From 2003 until the passage of the Twelfth Amendment in 2012, unit owners were allowed to lease their units as a permitted use under the declaration's express provision. Section 9.1.14 of Centre Pointe's original declaration, entitled "Lease Restrictions," informed owners that there is "no restriction on the right of any Unit Owner to lease his or her Unit" aside from certain documentation requirements not relevant here.[15] Moreover, both the original and amended declaration discuss leasing under Article IX of the declaration, "Permitted Uses; Architectural Uniformity." (Emphasis added.) Section 9.1, "Permitted Uses," includes subcategories such as "Residential

---

[15] Centre Pointe argues that the title of this subsection, "Leasing Restrictions," is not determinative because the word "uses" does not appear in the same paragraph. But the title, structure, and text of the section all support a conclusion that the declarant intended to expand the meaning of "use" beyond residential /nonresidential. Centre Pointe also contends that interpreting the declaration to require a 90 percent vote would make it virtually impossible for the Association to pass an amendment addressing any other matter governed by paragraphs in Article IX. This argument disregards the specific language of section 9.1.14. Moreover, in light of our holding that the WCA requires a 90 percent vote to impose new leasing restrictions, adopting Centre Pointe's argument would require us to hold that the declaration is inconsistent with the statute. We do not so hold. See Lake, 169 Wn.2d at 531 ("We think the parties to the declaration intended it to comply with the [Horizontal Property Regimes Act] not conflict with it").

Use," "Commercial Use," "Vehicle Parking," "Signs," "Animals," "Lease Restrictions,"

"Assignment or Subletting," and "Timesharing." And under "Residential Use," section

9.1.1 provides, "[T]he buildings and Units shall be used for residential purposes only,

and for common social, recreational or other reasonable uses normally incident to such

purposes." (Emphasis added.)[16]

Finally, we note that requiring 90 percent voter approval to amend the declaration

to impose significant new leasing restrictions protects the reasonable and settled

expectations of unit owners who purchased their units under the original declaration and

advances the legislature's intent to provide additional consumer protection to

condominium purchasers. See One Pac. Towers Homeowners' Ass'n v. HAL Real

Estate Invs., Inc., 148 Wn.2d 319, 330-31, 61 P.3d 1094 (2002) (discussing the strong

consumer protection features of the WCA).

---

[16] Other declaration provisions also indicate a broader meaning of "use." Article X, section 10.16.2 of the declaration describes the Association's lien for assessments and provides that the Association has a lien on property "not used principally for agricultural purposes, together with all tenements, hereditaments, and appurtenances now or hereafter thereunto belonging or in any manner appertaining, and the rents, issues, and profits thereof . . . ." (Emphasis added.) This section tracks RCW 64.34.364(9), which provides for enforceable liens if the declaration, among other things, "provides in its terms that the units are not used principally for agricultural or farming purposes . . . ." (Emphasis added.)
Exhibit D to the declaration contains a section titled "Schedule 12 – Condemnation." Under section 12.1:
If a Unit is acquired by condemnation, or if part of a Unit is acquired by condemnation leaving the Unit Owner with a remnant of a Unit which may not practically or lawfully be used for any purpose permitted by this Declaration, the award must compensate the Unit Owner for the Owner's Unit and its appurtenant interest in the Common Elements, whether or not any Common Elements are acquired.
(Emphasis added.)

Our conclusion is supported by our Supreme Court's analysis in Shorewood West Condominium Ass'n v. Sadri, 140 Wn.2d 47, 992 P.2d 1008 (2000), which interpreted the WCA's predecessor, the Horizontal Property Regimes Act (HPRA). In Shorewood, a condominium association amended its bylaws to restrict leasing. Shorewood, 140 Wn.2d at 51. The issue in Shorewood was whether "a restriction on use which appears in a condominium homeowners' association bylaw but not in the declaration [is] in accordance with the [HPRA]." Shorewood, 140 Wn.2d at 52. The court stated, "An association may apply a restriction on leasing, if adopted in accordance with the statute, to current owners." Shorewood, 140 Wn.2d at 54. The court began its analysis by noting that the HPRA requires that the condominium declaration contain a statement of use restrictions and that amendments must receive the consent of at least 60 percent of owners. The court further noted, "[A] survey of the case law from different jurisdictions indicates that it is the general practice to put specific restrictions, not merely restrictions on broad use categories, into the declaration, whether or not they may also be in the bylaws." Shorewood, 140 Wn.2d at 55-56. The court also found significant that the Association's declaration contained specific use restrictions beyond merely residential/nonresidential use and that the condominium declaration "discusses leasing and implicitly permits it." Shorewood, 140 Wn.2d at 56. The court concluded that "one should read 'use' in RCW 64.32.090(7) to mean all uses and not just general categories of use such as residential use or commercial use." Shorewood, 140 Wn.2d at 56. The court further concluded that use restrictions appearing in unrecorded amendments to bylaws and not in the declaration are not in accordance with the HPRA and are therefore invalid. Shorewood, 140 Wn.2d at 57.

-20-

Centre Pointe argues that <u>Shorewood</u> is distinguishable because the condominium in that case was governed by the HPRA rather than the WCA. Centre Pointe further notes that <u>Shorewood</u> did not involve a dispute over the percentage approval required to impose a restriction on leasing. However, despite these differences, we observe that both the HPRA and the WCA require certain disclosures in the declaration. Here, similar to the declaration in <u>Shorewood</u>, Centre Pointe's declaration contains specific use restrictions beyond the general residential/nonresidential categories. The declaration's structural text groups leasing in common with other permitted uses of the property.

The analogous context of restrictive covenants governing a homeowners' association is also instructive.[17] In <u>Wilkinson v. Chiwawa Communities Ass'n</u>, 180 Wn.2d 241, 245, 327 P.3d 614 (2014), our Supreme Court recently invalidated an amendment, passed by a simple majority vote, which prohibited short-term vacation rentals. As a general rule,

> when the general plan of development permits a majority to <u>change</u> the covenants but not create new ones, a simple majority cannot add new restrictive covenants that are inconsistent with the general plan of development or have no relation to existing covenants. This rule protects the reasonable, settled expectation of landowners by giving them the power to block "new covenants which have no relation to existing ones" and deprive them of their property rights.

<u>Wilkinson</u>, 180 Wn.2d at 256 (citations and internal quotation marks omitted) (quoting <u>Meresse v. Stelma</u>, 100 Wn. App. 857, 865-66, 999 P.2d 1267 (2000)). The association

---

[17] <u>See</u> 18 WILLIAM STOEBUCK, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 12.3 at 23 (2d. ed. 2004) ("The condominium declaration . . . is analogous in some respects to a declaration of restrictive covenants and in some respects to a subdivision plat.").

argued that the amendment was valid because short-term vacation rentals were inconsistent with restrictive covenants prohibiting commercial use and restricting lots to single family residential use. However, the court concluded, "The Chiwawa general plan of development allows homeowners to rent their homes without any durational limitation." Wilkinson, 180 Wn.2d at 257. Because the covenants did not place residents on notice that short-term rentals would be prohibited, the court held that the amendment must be invalidated to protect the "reasonable and settled expectations of landowners in their property." Wilkinson, 180 Wn.2d at 257. Here, similarly, the Centre Pointe declaration plainly indicates that condominium purchasers have a right to lease their units. Requiring the Association to obtain 90 percent approval to impose a new leasing restriction scheme that substantially alters the status quo protects condominium owners' reasonable and settled expectations.

In sum, we hold that "the uses to which any unit is restricted," in RCW 64.34.264(4) and the Centre Pointe declaration encompasses leasing as a "use" of the property. A lease restriction via declaration amendment requires a 90 percent vote. The Twelfth Amendment, which was passed with a 67 percent vote, is therefore invalid.

### Estoppel

Centre Pointe argues that Filmore was estopped by its inequitable conduct to challenge the Twelfth Amendment for lack of 90 percent approval. The elements of equitable estoppel are "(1) [a]n admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of such admission, statement or act; and (3) injury to such other party from allowing the first party to contradict or repudiate such admission, statement, or act." Finch v. Matthews, 74

-22-

Wn.2d 161, 171 n.3, 443 P.2d 833 (1968). This doctrine is not favored and must be proved by clear, cogent, and convincing evidence. Robinson v. City of Seattle, 119 Wn.2d 34, 82, 830 P.2d 318 (1992).

Centre Pointe claims that "Filmore's conduct, acting as if it was going to sell the units, together with its silence at critical times when it would have been expected to speak up, was inconsistent with its position taken after the instant lawsuit was served." Appellant's Br. at 29. We disagree. "Estoppel can arise through silence, as well as statements, when one has a duty to speak out." McDaniels v. Carlson, 108 Wn.2d 299, 308, 738 P.2d 254 (1987) (emphasis added). Even viewing the facts most favorably to Centre Pointe, it has failed to show that Filmore owed any duty to speak. Filmore's silence involved no representation of fact, and even if it did, it was not inconsistent with Filmore's later claim that the amendment was invalid.

Centre Pointe further claims that if André Molnar had told the Association his position that 90 percent approval was required, the Association would have had the opportunity to pursue 90 percent approval. But Centre Pointe cites no authority requiring a plaintiff to disclose the nature of its challenges and give the defendant an opportunity to cure prior to filing a lawsuit. Moreover, Centre Pointe's assertion that it would have pursued 90 percent approval is speculative. Elements established by virtue of speculation or conjecture are insufficient to warrant estoppel. Pub. Util. Dist. No. 1 of Douglas County v. Cooper, 69 Wn.2d 909, 918, 421 P.2d 1002 (1966). Centre Pointe's estoppel argument fails.

Attorney Fees

Filmore requests appellate attorney fees and costs as the prevailing party under RAP 18.1, Article XIII of the declaration,[18] and RCW 64.34.455.[19] Filmore also refers to a Bylaw that is not in our record as well as the trial court's summary judgment order below, in which the court ordered that "both parties retain rights to make claims for attorney's fees to be reviewed through subsequent proceedings before this court."[20] Review of the cited authorities indicates that they either fail to support Filmore's request or confer discretion on the court in making a fee award. Given the debatable issues of law presented in this case, we deny Filmore's request.

## CONCLUSION

The "uses to which any unit is restricted" under RCW 64.34.264(4) unambiguously includes leasing. The declaration is consistent with the statute. We conclude that 90 percent approval of unit owners is required to amend the declaration to impose new leasing restrictions. The Twelfth Amendment, which was passed with 67 percent approval, is inconsistent with the WCA and the original declaration and is

---

[18] Article XIII of the declaration provides that every "Owner and occupant of a Unit shall comply strictly with the provisions of the Condominium Act or the Condominium Instruments" and gives the Board of Directors the power to enforce the same. The Article does not mention attorney fees.

[19] RCW 64.34.455 provides, "If a declarant or any other person subject to this chapter fails to comply with any provision hereof or any provision of the declaration or bylaws, any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief. The court, in an appropriate case, may award reasonable attorney's fees to the prevailing party."

[20] Neither party requested fees below, and the court's order awarded no fees. The order simply preserved each party's right to make future fee requests.

-24-

70013-8-I/25

therefore invalid. We affirm the order on summary judgment invalidating the Twelfth Amendment.

_____ J.

WE CONCUR:

_____ J.          _____ J.