IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| H. C. BURKHOLDER, | No. 88021-7-I |
| Appellant, | |
| v. | |
| POLLUTION CONTROL HEARINGS BOARD; and STATE OF WASHINGTON DEPARTMENT OF ECOLOGY, | UNPUBLISHED OPINION |
| Respondents. | |

BOWMAN, A.C.J. — This appeal arises from H. C. Burkholder's request to drill 14 groundwater wells on his property in the water-scarce Methow River basin. The Department of Ecology (Ecology) denied Burkholder's requests, the Pollution Control Hearings Board (PCHB) granted Ecology's summary judgment dismissal of Burkholder's challenge to that denial, and the superior court affirmed the PCHB. Representing himself, Burkholder argues that Ecology had no valid scientific or legal justification to deny his requests. He also asserts that the superior court erred by refusing to allow discovery related to the PCHB's allegedly unlawful decision process and allowing Ecology to submit supplemental evidence rebutting that claim. Finding no error, we affirm.

FACTS

Burkholder owns about 180 acres of land near Winthrop, which he seeks to develop by building single family homes on 5-acre parcels.  A significant portion of Burkholder's land is in the Thompson Creek subarea of the Methow River basin.  During the summer and fall months, the headwaters of Thompson Creek regularly run dry, while the lower portion of the creek runs low.

In 1976, under its statutory authority to set minimum instream flows by rule, Ecology adopted chapter 173-548 WAC to implement a comprehensive water resources program in the Methow River basin.  Former WAC 173-548-050 (1976), known as the "Methow Rule," closed Thompson Creek and other streams and lakes in the Methow River basin to further consumptive water appropriation. As amended in 1991, the Methow Rule prohibits new wells in administratively closed areas unless the applicant satisfies one of the four conditions listed in subsections (1) through (4) of the rule and Ecology approves construction of the well "in writing."  WAC 173-548-050.  Relevant here, Ecology may approve a withdrawal of water if it determines that the sought-after groundwater is not "hydraulically connected with surface waters" listed as "closed" under WAC 173-548-050(4).

In early 2018, Burkholder filed authorization requests with Ecology to drill 14 wells on his property for development.  Of the proposed wells, 13 are located in the Thompson Creek restricted drilling area, and the remaining well is in the

Elbow Coulee area south of Thompson Creek.[1]  Residents in the nearby Pine Forest subdivision asked Ecology to deny Burkholder's request under the Methow Rule because, among other concerns, Burkholder could not show that his proposed wells are not in hydraulic continuity with Thompson Creek.

On March 13, 2018, Burkholder e-mailed Ecology's well drill coordinator, Avery Richardson, asking if he could get his well authorizations by March 23.  In response, Richardson said that he had "written the template letter for the authorization for [Burkholder's] project, so the subsequent letters are very simple to write," and that he was "sure [Burkholder] will have the letters in hand before March 23, 2018."  On April 3, 2018, Trevor Hutton, Ecology's Central Regional Office Water Resources Program section manager, told Burkholder that Ecology had not decided on his well authorization requests, noting that the department was still in the process of developing "guidance related to interpretation of" the Methow Rule.  Then, in August 2018, Okanogan County issued a "threshold" mitigated determination of nonsignificance for Burkholder's short plats, stating that his proposal "does *not* have a probable significant adverse impact on the environment if mitigating conditions . . . are met" under the State Environmental Policy Act, chapter 43.21C RCW.

In December 2018, Ecology revised its technical and policy positions on water availability within areas subject to the Methow Rule.  After the 1991

---

[1] In June 2018, Ecology adjusted the boundaries of the Thompson Creek restricted drilling area that includes part of Burkholder's property.  The new boundaries omitted "[a] small portion of Elbow Coulee south of Thompson Creek," which had been "incorrectly included within the Thompson Creek watershed."

amendments to the Methow Rule, Ecology had allowed construction of permit-exempt domestic wells in the bedrock aquifers of closed tributary basins because "deeper fractured bedrock aquifers were *not believed* to be in direct hydraulic continuity with the closed tributaries." During that time, Ecology's position was that it could approve new bedrock wells in restricted areas even though there might have been some "indirect" hydraulic continuity with administratively closed surface waters.[2] But subsequent case law led Ecology to question whether water is legally available under these circumstances.

In *Postema v. Pollution Control Hearings Board*, our Supreme Court held that an agency must deny any application for a water right unless there is no impact, even de minimis, on closed surface waters. 142 Wn.2d 68, 82, 94-95, 11 P.3d 726 (2000). And then *Swinomish Indian Tribal Community v. Department of Ecology* clarified that the same principle applies to permit-exempt wells. 178 Wn.2d 571, 598, 311 P.3d 6 (2013). So, because Ecology could not determine with certainty that hydraulic continuity in certain bedrock systems is entirely lacking, it concluded that it could no longer authorize "development of bedrock wells in the closed Methow subbasins" unless the applicant provided a valid way to mitigate water use or provided "additional information sufficient for [Ecology] to determine that hydraulic continuity does not exist and that water is available" under WAC 173-548-050(4).

---

[2] Indirect hydraulic continuity occurs when "fractured bedrock systems capture[ ] water during certain times of the year that would otherwise have discharged to the closed tributary stream through near-surface runoff."

Throughout 2019, Ecology communicated with Burkholder about viable options for him to proceed with his project under its updated technical and policy positions. Burkholder asserted that Ecology's prior hydrogeological investigations and well authorizations documented its belief that the bedrock aquifers under his property are not in hydraulic continuity with Thompson Creek. Ecology disagreed and advised Burkholder that its preferred option would be for him to drill his wells in the Elbow Coulee portion of his property, which lies outside the restricted area of Thompson Creek. Ecology also suggested that it could allow Burkholder to drill within the restricted area of his property if he could "design a system that would supply water from the Elbow Coulee portion of [his] property," which would mitigate water use within the restricted area. Ecology emphasized that Burkholder would need to limit the scope of his proposed development to qualify for a groundwater permit exemption under RCW 90.44.050 for "any withdrawal of public groundwaters . . . for single or group domestic uses in an amount not exceeding five thousand gallons a day."

Rather than pursue these options, Burkholder proposed that Ecology authorize him to drill 14 test wells and conduct a "tracer-based" hydrologic test program to determine the existence and extent of any hydraulic continuity between the bedrock aquifers under his land and Thompson Creek. Ecology questioned whether Burkholder's proposal would yield the required quantum of proof. Ecology nevertheless advised Burkholder that he could implement his

5

testing proposal if he retained a consultant specializing in complex bedrock hydrogeology to provide Ecology with

> a written assessment of the likelihood that [the consultant] can, with a high degree of confidence, determine that a) the water in the bedrock fractures of the area where the wells will be drilled is not hydraulically connected to Thompson Creek AND b) that none of the water recharging the fractures feeding into those wells originates from within the Thompson Creek Basin or alternatively, if it does originate within the basin, that the water would never have made it to Thompson Creek regardless of the bedrock recharge conditions.

Burkholder did not do so.

In February 2020, Burkholder informed Ecology that its refusal to authorize his well requests "lacks any reasonable rationale." In response, Ecology again explained in detail the legal and scientific developments underlying its decision process and reiterated the need for Burkholder to provide more information on his tracer testing proposal before it could consider authorizing preliminary permits. Burkholder again did not provide the hydrologic analysis or requested information.

In May 2020, Burkholder notified Ecology that he intended to begin drilling his wells. On June 5, 2020, Ecology formally denied Burkholder's well authorization requests in writing under WAC 173-548-050(4). Burkholder then appealed to the PCHB. Both parties moved for summary judgment, claiming that the undisputed facts entitled each to judgment as a matter of law.

On November 3, 2021, the PCHB's presiding officer sent a letter notifying the parties that the board would be granting Ecology's motion for summary judgment, denying Burkholder's cross motion, and dismissing his appeal. The

6

presiding officer noted that she was providing the letter only "as a courtesy to the parties" and specified that it "does not constitute the [PCHB]'s final decision and order on the parties' motions, which will be issued at a later date."

On January 26, 2022, the PCHB issued its final order granting summary judgment dismissal of Burkholder's claims. Burkholder then moved for reconsideration, which the PCHB denied. On April 4, 2022, Burkholder petitioned the superior court for judicial review of the PCHB's final order.

While his appeal to the superior court was pending, Burkholder asked the Environmental and Land Use Hearings Office (ELUHO)[3] for an opportunity to "pre-review" the board's administrative record. Although the ELUHO does not have a process to allow prereview of the record, it provided Burkholder with an electronic copy of documents that would be included in the record with an index of documents dated by order received.

After reviewing the documents, Burkholder notified the ELUHO that the record was incomplete and alleged that the appeal was a " 'sham' " because the records index showed the PCHB decided Ecology's motion for summary judgment before reviewing and entering into the record his response to the motion. The ELUHO admitted that it had "inadvertently omitted" some documents from the record it compiled for Burkholder's prereview but denied his claim that the PCHB based its final decision on an incomplete record. After supplementing Burkholder's copy of the record with the missing documents and

---

[3] The ELUHO is the umbrella agency housing the PCHB.

an updated index showing the correct date each document was filed with the PCHB, the ELUHO concluded that the record was complete.

Burkholder then moved the superior court to require the ELUHO to revise the record index to reflect the dates that he believed certain documents had entered the record. Ecology asked the court to deny the motion because the agency record was not yet on file with the court. Burkholder then moved the court to issue an order directing the ELUHO to investigate the dates on which it had received certain filings and to provide copies of the policies and procedures governing its custody of litigation filings and assembly of the record. The superior court denied Burkholder's motion as premature.

On July 5, 2022, the PCHB transmitted the certified administrative record to the superior court. Two days later, Burkholder moved the superior court to issue an order (1) correcting the record to show that his summary judgment response entered the record on a date later than that reflected in the index, (2) requiring the ELUHO and the PCHB to provide copies of all policies and procedures governing management of litigation filings, and (3) authorizing Burkholder to depose individual PCHB and ELUHO employees.

On September 30, 2022, the superior court denied Burkholder's investigation requests but allowed him to supplement the record on appeal with evidence "limited to" correspondence with PCHB staff showing that "documents entered the record at such a time that the PCHB could not have considered them in making its decision on summary judgment." The court also allowed Ecology and the PCHB to provide additional evidence in response. The court then

8

ordered the parties to supplement the record with the new declarations and exhibits.

In August 2023, the superior court held a hearing on Burkholder's petition for review. On November 14, 2023, it affirmed the PCHB's order granting Ecology's motion for summary judgment and found "no merit" to Burkholder's claims that the PCHB's decision making process and procedures were unlawful. Burkholder then moved for reconsideration and clarification of the court's order. And he filed another motion to supplement the record. The superior court denied his request to supplement the record but allowed him to revise the arguments raised in his pending motion for reconsideration. Burkholder then filed a revised motion for reconsideration and clarification, which the court denied.[4]

Burkholder appeals.

ANALYSIS

Burkholder raises 10 assignments of error, which can be grouped into two broad categories: (1) the PCHB's summary judgment dismissal of Burkholder's challenge to Ecology's decision denying his well authorization requests, and (2) the superior court's rulings on Burkholder's assertion that the PCHB's decision resulted from an unlawful procedure or decision making process. We address each category in turn.

---

[4] Burkholder asserts that the superior court forced him to file this appeal because it "declined to process" his motion for reconsideration. But the order expressly states that the court "carefully reviewed and considered" Burkholder's arguments and, applying CR 59(a), found that reconsideration was "not warranted."

1. <u>Summary Judgment</u>

Burkholder argues that the superior court erred in affirming the PCHB's decision granting Ecology's motion for summary judgment and upholding its denial of Burkholder's request to drill 14 wells on his property. But this court reviews the administrative decision of the PCHB, not the decision of the superior court. *See, e.g.*, *Burbank Irrig. Dist. #4 v. Dep't of Ecology*, 27 Wn. App. 2d 760, 771, 534 P.3d 833 (2023).

Washington's Administrative Procedure Act (APA), chapter 34.05 RCW, governs appeals from the PCHB.[5] *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 587, 90 P.3d 659 (2004). We conduct the same review as the superior court and directly apply APA standards to the record before the PCHB. *Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 173 Wn. App. 310, 325, 293 P.3d 1248 (2013). The party challenging the agency action bears the burden of demonstrating its invalidity. RCW 34.05.570(1)(a). We may grant relief from an agency order in an adjudicative proceeding if, among other reasons, (1) the agency has erroneously interpreted or applied the law, (2) the agency has engaged in an unlawful procedure or decision making process, or (3) the agency order is arbitrary and capricious. RCW 34.05.570(3)(d), (c), (i). "An agency action is arbitrary or capricious if it 'is willful and unreasoning and taken

---

[5] Burkholder asserts that the United States Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024), governs our review. *Loper Bright* held that the federal APA requires federal courts to exercise independent judgment in determining whether a federal agency has acted within its statutory authority and not defer to the agency's interpretation of a statute merely because it is ambiguous. *Id.* at 412-13. Burkholder does not argue that WAC 173-548-050 is ambiguous, and even if he did, *Loper Bright* would not govern our review under Washington's APA.

without regard to the attending facts or circumstances.' " *Honeywell v. Dep't of Ecology,* 2 Wn. App. 2d 601, 611, 413 P.3d 41 (2017)[6] (quoting *Port of Seattle,* 151 Wn.2d at 589).

When the agency decision was on summary judgment, "the reviewing court must overlay the APA standard of review with the summary judgment standard." *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 916, 194 P.3d 255 (2008). So, we review the facts in the administrative record de novo and in a light most favorable to the nonmoving party and affirm summary judgment when the undisputed material facts entitle the moving party to judgment as a matter of law. *Id.* We review questions of law and the agency's application of the law de novo. *Port of Seattle*, 151 Wn.2d at 588.

Burkholder argues that relief is warranted under RCW 34.05.570(3)(d) and (i) because Ecology failed to show any legal or technical justification to abandon its historical practice of authorizing construction of bedrock wells that may have a small impact on closed surface waters.[7] He contends that Ecology must suspend its "moratorium" on drilling until it can prove the presence of indirect connectivity at specific locations and depths. We disagree.

Washington water law is governed by the doctrine of prior appropriation. *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 7, 43 P.3d 4 (2002); *see* RCW 90.03.010. "A basic principle of water rights acquired by appropriation

---

[6] Internal quotation marks omitted.

[7] Burkholder also argues that relief is warranted under RCW 34.05.570(3)(e) because the decision was unsupported by substantial evidence. But that standard does not govern review of the facts here because the administrative decision on review was made on summary judgment. *See Verizon*, 164 Wn.2d at 916 n.4.

is the principle of first in time, first in right." *Postema*, 142 Wn.2d at 79. Ecology is authorized by statute to establish minimum instream flows through administrative rulemaking. RCW 90.22.010; *Ctr. for Env't Law & Policy v. Dep't of Ecology*, 196 Wn.2d 17, 32, 37, 468 P.3d 1064 (2020). "[M]inimum flows or levels, once established, have priority over later acquired appropriative water rights." *Swinomish*, 178 Wn.2d at 595. In administering water allocation and use, Ecology must give "[f]ull recognition . . . to the natural interrelationships of surface and groundwaters." RCW 90.54.020(9).

The Methow Rule closes certain streams and lakes and the withdrawal of groundwater hydraulically connected with those surface waters to further consumptive appropriation based on Ecology's determination "that there are no waters available for further appropriation." WAC 173-548-050. The rule presumptively bars the construction of groundwater wells "for any purposes" in administratively closed areas unless the applicant satisfies one of the four express conditions under the rule and Ecology approves the application "in writing" before construction begins. *Id.*

WAC 173-548-050(4) offers two ways for an applicant to rebut the presumption against well construction. First, Ecology may approve a withdrawal "[i]f the groundwater being sought for withdrawal has been determined by [Ecology] not to be hydraulically connected with surface waters listed as closed." *Id.* Second,

> [w]hen insufficient evidence is available to [Ecology] to make a
> determination that ground and surface waters are not hydraulically
> connected, [Ecology] shall not approve the withdrawal of
> groundwater unless the person proposing to withdraw the

12

groundwater provides additional information sufficient for [Ecology] to determine that hydraulic continuity does not exist and that water is available.

*Id.*

Under the plain language of WAC 173-548-050(4), Ecology could not approve Burkholder's request unless it determined that the groundwater he seeks to withdraw is not hydraulically connected with Thompson Creek, or Burkholder provided additional information sufficient for Ecology to determine that hydraulic continuity does not exist and water is available. Burkholder made neither showing.

A. Hydraulic Continuity

First, Burkholder argues that the PCHB ignored factual evidence demonstrating that Ecology believed "from 1991 through at least March 19, 2019" that hydraulic continuity was absent at bedrock wells upstream of the Thompson Creek's bedrock canyon. We disagree.

Burkholder points to a June 2018 report by Ecology hydrogeologist Kurt Walker (Walker Report) that updated and supplemented the analysis provided in a 1991 Ecology report on the relationship between groundwater and surface water in the Thompson Creek basin. Focusing on shallow groundwater rather than the deeper water in bedrock aquifers, the 1991 report concluded that "a high degree of hydraulic continuity exists between the ground water in the glacial-fluvial sediments and both Thompson Creek and Patterson Lake." Commenting on the 1991 report, the Walker Report stated that "[g]roundwater within the

bedrock units was generally not considered to be in hydraulic continuity with the stream," and that "there is currently no effort to re-investigate these conclusions."

Burkholder asserts that the Walker Report reaffirmed Ecology's 1991 determination that hydraulic continuity was absent upstream of the Thompson Creek basin's bedrock canyon where he would drill his proposed wells. But the 1991 report contains no determination that Ecology ruled out the presence of hydraulic continuity between bedrock aquifers in the Thompson Creek area and Thompson Creek or that the bedrock aquifer under Burkholder's property lacks hydraulic continuity with Thompson Creek. Notably, the Walker Report focused primarily on an area downstream of Burkholder's property and did not assess the potential impacts to Thompson Creek through indirect connectivity. Contrary to Burkholder's claim, these reports do not make a conclusive determination that the groundwater under his property is not hydraulically connected to Thompson Creek.

Next, Burkholder argues that a one-page Ecology report for a bedrock well drilled on a neighboring parcel in 1996 (Lenchek Well Report) proves that the bedrock aquifer under his property lacks hydraulic continuity with Thompson Creek. He points to the report's finding that hard black shale between depths of 40 and 100 feet confirmed the existence of a "60-foot-thick aquiclude." But a one-page report for a single well located a mile away does not show a lack of hydraulic continuity on Burkholder's land. Indeed, Ecology's hydrogeologist noted that the bedrock shale at the Lenchek well site is not the same kind of rock that exists where Burkholder seeks to drill his wells and opined that the Lenchek

14

Well Report provided little insight into the potential impacts of Burkholder's proposed wells. And even Burkholder acknowledged that without drilling test wells on his property, it is impossible to know with certainty whether the geology is the same.

Burkholder further argues that Ecology could not have lawfully approved the Lenchek well unless it had determined that "hydraulic continuity was absent." But, as discussed above, for years following the 1991 amendments to the Methow Rule, Ecology believed that it could approve new bedrock wells in restricted areas even though there might have been some minimal impacts with closed surface waters. Then *Postema* and its progeny clarified that even minimal impact on closed surface waters is not permissible. 142 Wn.2d at 82, 94-95; *see Swinomish*, 178 Wn.2d at 598. In light of these decisions, Ecology realized that its historical approach was no longer legal. So, Ecology concluded it cannot authorize new bedrock wells in closed areas without evidence of a lack of hydraulic connectivity consistent with WAC 173-548-050(4). It did not err in doing so. *See Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 598, 957 P.2d 1241 (1998) (Ecology did not act arbitrarily and capriciously in abandoning unlawful method of quantifying a water right).

Still, Burkholder argues that *Postema* and *Swinomish* apply to only "wells drilled into near-surface aquifers" and are irrelevant to the bedrock wells he seeks to drill because deep bedrock aquifers are less likely to be in hydraulic continuity with closed surface streams. But *Postema* plainly held that "a proposed withdrawal of groundwater from a closed stream or lake in hydraulic

continuity must be denied if it is established factually that the withdrawal will have any effect on the flow or level of the surface water." 142 Wn.2d at 95. Nothing in *Postema* supports the proposition that it should be read narrowly to exclude bedrock aquifers.

Finally, Burkholder asserts that Ecology actually approved his well requests. He points to the March 13, 2018 e-mail from Ecology well drill coordinator Richardson opining that he was "sure" Burkholder would have the authorization letters "in hand before March 23, 2018." And Burkholder claims Ecology water resources manager Hutton confirmed that decision via e-mail on April 3, 2018 by acknowledging that "the process has taken longer than originally thought" but he was "hopeful that we can get [Burkholder] something soon." Even viewed in a light most favorable to Burkholder, these e-mails do not support an inference that Ecology formally approved his request. Hutton's e-mail clearly indicated that the "process" was still ongoing. And as much as Richardson's e-mail reflected an optimistic belief that Ecology would approve Burkholder's application "soon," Richardson was only the coordinator and lacked authority to formally approve Burkholder's request.

B. <u>Evidence of Hydraulic Conditions Specific to Burkholder's Wells</u>

Burkholder claims that because Ecology adopted a technically unsupported belief that indirect hydraulic continuity between bedrock aquifers and surface streams is "universal," it imposed an unlawful drilling "moratorium" that "suspended the administration of WAC 173-548-050(4)." Burkholder misreads WAC 173-548-050(4) and misconstrues Ecology's position.

16

Ecology's technical assessments indicate that indirect hydraulic continuity may exist between fractured bedrock aquifers and closed surface waters. By its plain terms, WAC 173-548-050(4) prohibits new wells in administratively closed areas unless Ecology determines that hydraulic continuity "does not exist." As discussed above, Ecology currently lacks sufficient information to make this determination as to Burkholder's proposed wells. So, legally, Ecology cannot authorize his wells without evidence of a lack of hydraulic connectivity consistent with WAC 173-548-050(4).

Burkholder insists that Ecology gave no reason why he could not drill 14 wells for "tracer testing." But WAC 173-548-050 expressly prohibits the construction of wells "for any purposes" unless the applicant meets one or more of the specified conditions in subsections (1) through (4) of the rule and Ecology approves well construction in writing. And it is undisputed that Burkholder did not seek preliminary permits or provide the additional information that Ecology needed before it could consider his tracer-testing proposal. Still, Burkholder asserts that Ecology claimed it lacked authority to enter his proposed tracer-testing agreement on "false" pretenses. But Ecology appropriately told Burkholder that it could not enter his proposed agreement because the scope of his project appeared to exceed the groundwater permit requirements.

It is also undisputed that Ecology suggested alternatives that could allow Burkholder to obtain water, including drilling in the Elbow Coulee area of his property or drilling within the restricted area of his property if he could design a

system to supply water from the Elbow Coulee portion to mitigate water use within the restricted area.

Ecology did not err by denying Burkholder's well requests without evidence of a lack of hydraulic connectivity consistent with WAC 173-548-050(4).

C. Vested Rights

Burkholder argues that he has vested development rights under WAC 173-548-030, the Methow Rule's reservation of future surface water allocation for single domestic use. We disagree.

Washington's vested rights doctrine, which arose under common law but is now statutory, entitles developers "to have a land development proposal processed under the regulations in effect at the time a complete building permit application is filed, regardless of subsequent changes in zoning or other land use regulations." *Abbey Rd. Grp., LLC v. City of Bonney Lake*, 167 Wn.2d 242, 250-51, 218 P.3d 180 (2009), *abrogated on other grounds by Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019); RCW 19.27.095(1); RCW 36.70B.180. But no authority supports the proposition that groundwater permitting requirements are land use ordinances for the purposes of the vesting statutes. *See Snohomish County v. Pollution Control Hr'gs Bd.*, 187 Wn.2d 346, 362, 386 P.3d 1064 (2016) ("the vested rights doctrine grew out of a concern that municipalities were abusing their discretion with respect to land use and zoning rules"). And, even if it did, WAC 173-548-030 does not authorize any impact to closed surface waters.

Burkholder also argues that Ecology must approve his well proposal

pursuant to an Okanogan County Superior Court summary judgment order in an

unrelated case.[8] There, the superior court ruled that a building permit application

for a single family home on a single lot that is unrelated to any other building

permit application may rely on the reservation for single domestic use under

WAC 173-548-030, and that owners of vacant lots created by subdivision "may"

have vested rights to build homes based on prior subdivision approvals that

included a determination of legal water availability.[9] But the superior court in that

case did not rule that all property owners have vested rights to appropriate water

from closed surface waters in violation of WAC 173-548-050.[10]

In sum, the PCHB did not err in rejecting Burkholder's challenge to

Ecology's decision to deny his well drilling applications.

2. Agency Decision Procedures and Processes

Burkholder argues that the superior court erred in refusing to allow him to

conduct discovery into the ELUHO's and the PCHB's custodial processes. He

contends the PCHB's decision making process was unlawful when it decided

Ecology's motion for summary judgment without considering his response. We

disagree.

---

[8] *See* Amended Order on Cross Motions for Summary Judgment *After* Reconsideration, *Okanogan County v. Dep't of Ecology*, No. 21-2-00039-24 (Okanogan County Super. Ct. Nov. 5, 2021).

[9] *Id.*, at 3-4.

[10] *See id.*

This court will grant relief from an agency order if it determines "[t]he agency has engaged in [an] unlawful procedure or decision-making process, or has failed to follow a prescribed procedure." RCW 34.05.570(3)(c). We review the superior court's refusal to allow a party to engage in discovery for abuse of discretion. *Wash. Independent Tel. Ass'n v. Wash. Util. & Transp. Comm'n*, 110 Wn. App 498, 518, 41 P.3d 1212 (2002), *aff'd*, 149 Wn.2d 17, 65 P.3d 319 (2003).

Burkholder asserts that his correspondence with the ELUHO and the PCHB show that his brief in response to Ecology's summary judgment motion did not become part of the record until January 20, 2022, more than two months after the PCHB sent its November 3, 2021 letter notifying the parties of its decision. Ecology argues that Burkholder's claim is based on a "speculative belief" that the "date modified" data field associated with the electronic copy of his pleading in the uncertified administrative record conclusively proves that the PCHB did not download his summary judgment response until January 20, 2022. The ELUHO acknowledged that "the dates related to some documents" it first provided in response to Burkholder's preliminary review of the record could have been "confusing." But, even viewing the facts in a light most favorable to Burkholder, he shows no basis for relief.

The PCHB November 3, 2021 letter expressly stated that it was not the board's final decision. To the contrary, the PCHB issued its final appealable order on January 26, 2022—six days after Burkholder claims the PCHB received his summary judgment response brief. And that order expressly lists

20

Burkholder's summary judgment response brief as one of the documents the PCHB considered in reaching its decision. Further, the board cites his response brief several times in its decision. Finally, the record contains date stamped correspondence that shows the PCHB received his brief by e-mail on September 2, 2021 and by mail on September 8, 2021.

In light of the evidence, the superior court did not err in denying Burkholder's request to further investigate the matter. *See Motley-Motley, Inc. v. Pollution Control Hr'gs Bd.*, 127 Wn. App. 62, 76, 110 P.3d 812 (2005) (RCW 34.05.562(1) permits the superior court to accept new evidence in addition to the agency record "only under highly limited circumstances").

Burkholder also argues that the superior court improperly allowed the PCHB to supplement the record with sworn declarations from the ELUHO's executive director and its director of legal administrative services, rebutting his claim that the PCHB did not download his response brief until after it made its summary judgment decision. He contends that the ELUHO directors "had no first-hand knowledge" of the matter and that the court should have required the PCHB members to submit their own sworn declarations. Again, we disagree.

We review the superior court's decision regarding supplementation of the record under RCW 34.05.562 for abuse of discretion. *Ctr. for Biological Diversity v. Dep't of Fish & Wildlife*, 14 Wn. App. 2d 945, 964, 474 P.3d 1107 (2020). Here, Burkholder has not shown that the directors made their declarations without firsthand knowledge, and even if he did, we agree with Ecology that such

21

declarations would have been unnecessary and duplicative in light of the evidence discussed above.

We affirm the PCHB's final decision.

_____, ACJ

WE CONCUR:

_____
Díaz, J.

_____